# 23-7352-cr

To be argued by:
**DARRELL FIELDS**

---

**United States Court of Appeals
for the Second Circuit**
_____

Docket No. 23-7352-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

FRANK JAMES,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

<u>**CORRECTED**</u> **BRIEF FOR DEFENDANT-APPELLANT FRANK JAMES**

---

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**FRANK JAMES**

**DARRELL FIELDS,**
<u>Of Counsel</u>

---

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement Pursuant to Fed. R. App. P. 28(a) . . 1

Questions Presented . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . 4

Statement of Facts . . . . . . . . . . . . . . . . . . . 5

     I.   Frank James's history of mental illness . . . . . . . 5

    II.  The offense, indictment, and motion to dismiss
        the indictment . . . . . . . . . . . . . . . . . 12

    III. The guilty plea . . . . . . . . . . . . . . . . . 14

        A.   The Government's pre-plea letter concerning
           the elements of the crime and the Guidelines
           range . . . . . . . . . . . . . . . . . . . 14

        B.   The guilty plea allocution . . . . . . . . . 15

    IV.  The Presentence Report ("PSR") . . . . . . . . . 18

        A.   The offense level calculation . . . . . . . 18

        B.   Frank James's Criminal History . . . . . . . 20

        C.   The Sentencing Guidelines range . . . . . . . 22

     V.   The sentencing submissions . . . . . . . . . . . 24

        A.   The Government's submission . . . . . . . . 24

        B.   Defense counsel's submission . . . . . . . . 28

    VI. The sentencing . . . . . . . . . . . . . . . . . . 30

Summary of Argument . . . . . . . . . . . . . . . . . . 32

Point I . . . . . . . . . . . . . . . . . . . . . . . . . . 34

The district court should not have imposed an obstruction
enhancement based on the defendant's guilty plea allocution
in which he admitted to the elements of the offenses, but
related that he subjectively believed he did not intend to
commit murder . . . . . . . . . . . . . . . . . . . . . . . 34

        A.   The standard of review . . . . . . . . . . . 34

        B.   The court should not have imposed the
            obstruction enhancement . . . . . . . . . . 34

Point II . . . . . . . . . . . . . . . . . . . . . . . . . 37

The district court erred in denying the defendant any
reduction whatsoever, under Sentencing Guidelines § 3E1.1,
after he timely accepted responsibility by pleading guilty
to all of the offenses in the superseding indictment . . . . 37

Point III . . . . . . . . . . . . . . . . . . . . . . . . . 40

The court should have applied Guidelines § 2A2.2, governing
an aggravated assault, which provides a base offense level
of 14, rather than the Guideline for assault with the intent
to commit intentional murder (of § 2A2.1, requiring a base
offense level of 33) . . . . . . . . . . . . . . . . . . . . 40

Point IV . . . . . . . . . . . . . . . . . . . . . . . . . 44

Appellant's motion to dismiss the indictment should have
been granted . . . . . . . . . . . . . . . . . . . . . . . 44

    I.   18 U.S.C. § 1992(a)(7) does not extend to a
       shooting committed on a subway car . . . . . . . . 44

    II.  The Aggravated Offense of § 1992(b) Does Not Apply
       to § 1992(a)(7) . . . . . . . . . . . . . . . . . . 50

    III. A violation of section 1992(a)(7) is not
       categorically a  crime of violence under
       18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . 52

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . 56

## TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Borden v. United States</u>,
  141 S. Ct. 1817 (2019) . . . . . . . . . . . . . . . 52, 53

<u>Braxton v. United States</u>,
  500 U.S. 344 (1991) . . . . . . . . . . . . . . . . 41, 42

<u>Descamps v. United States</u>,
  570 U.S. 254 (2013) . . . . . . . . . . . . . . . . 52, 53

<u>Gall v. United States</u>,
  552 U.S. 49 (2007) . . . . . . . . . . . . . . . . . . 32

<u>Hylton v. Sessions</u>,
  897 F.3d 57 (2d Cir. 2018) . . . . . . . . . . . . . . 52

<u>Kimbrough v. United States</u>,
  552 U.S. 111 (2007) . . . . . . . . . . . . . . . . . 32

<u>Kmart Corporation v. Cartier, Incorporated</u>,
  486 U.S. 281 (1988) . . . . . . . . . . . . . . . . . 45

<u>Nancie D. v. New York Central Mutual Fire Insurance Company</u>,
  600 N.Y.S.2d 472 (N.Y. App. Div. 2d Dep't 1993) . . . . . . 42

<u>People v. (Bernard) Goetz</u>,
  68 N.Y.2d 96, 506 N.Y.S. 2d (1989) . . . . . . . . . 48

<u>People v. Greiner</u>,
  549 N.Y.S.2d 831 (N.Y. App. Div. 3d Dep't 1989) . . . . . . 43

<u>People v. Terry</u>,
  479 N.Y.S.2d 278 (N.Y. App. Div. 2d Dep't 1984) . . . . . . 43

<u>Portee v. United States</u>,
  941 F.3d 263 (7th Cir. 2019) . . . . . . . . . . . . . 53

<u>Rita v. United States</u>,
  551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . 32

<u>Russello v. United States</u>,
  464 U.S. 16 (1983) . . . . . . . . . . . . . . . . 46, 47

<u>United States v. Agudelo</u>,
  414 F.3d 345 (2d Cir. 2005) . . . . . . . . . . . . . 36

United States v. Booker,
  543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . 32

United States v. Brown,
  321 F.3d 347 (2d Cir. 2003) . . . . . . . . . . . . . . 34

United States v. Canova,
  412 F.3d 331 (2d Cir. 2005) . . . . . . . . . . . . . . 36

United States v. Cassiliano,
  137 F.3d 742 (2d Cir. 1998) . . . . . . . . . . . . . . 34

United States v. Catano-Alzate,
  62 F.3d 41 (2d Cir. 1995) . . . . . . . . . . . . . 36, 38

United States v. Cavera,
  550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . 32

United States v. Davis,
  139 S. Ct. 2319 (2019) . . . . . . . . . . . . . . . . 52

United States v. Dunnigan,
  507 U.S. 87 (1993) . . . . . . . . . . . . . . . . . . 35

United States v. Kumar,
  617 F.3d 612 (2d Cir. 2010) . . . . . . . . . . . . . . 38

United States v. Kwong,
  14 F.3d 189 (2d Cir. 1994) . . . . . . . . . . . . 41, 42

United States v. Santos,
  553 U.S. 507 (2020) . . . . . . . . . . . . . . . . . . 50

United States v. Singh,
  877 F.3d 107 (2d Cir. 2017) . . . . . . . . . . . . . . 37

United States v. Taylor,
  596 U.S. 845 (2022) . . . . . . . . . . . . . . . . 54, 55

United States v. Ullah,
  2d Cir. No. 21-1058-cr, heard on Apr. 27, 2022 . . . . . . . 4

United States v. Velazquez,
  246 F.3d 204 (2d Cir. 2001) . . . . . . . . . . . . . . 41

United States v. Verkhoglyad,
  516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . 32

<u>United States v. Woodard</u>,
  239 F.3d 159 (2d Cir. 2001) . . . . . . . . . . . . . . .  34

<u>United States v. Yannotti</u>,
  541 F.3d 112 (2d Cir. 2008) . . . . . . . . . . . . . . .  44

**<u>Statutes and Other Authorities</u>**

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . .  <u>passim</u>

18 U.S.C. § 924 (c)(3)(A) . . . . . . . . . . . . . . . .  54

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . .  40, 41

18 U.S.C. § 1113 . . . . . . . . . . . . . . . . . .  41, 42

18 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . .  42

18 U.S.C. § 1991 . . . . . . . . . . . . . . . . . . . .  48

18 U.S.C. § 1992(4)(A) . . . . . . . . . . . . . . . . .  45

18 U.S.C. § 1992(a)(7) . . . . . . . . . . . . . . .  <u>passim</u>

18 U.S.C. § 1992(b) . . . . . . . . . . . . .  2, 4, 13, 33, 50

18 U.S.C. § 1993 . . . . . . . . . . . . . . . . . .  48, 49

18 U.S.C. § 1993(a)(6) . . . . . . . . . . . . . . . . .  49

18 U.S.C. § 1997(a)(7) . . . . . . . . . . . . . . . . .  29

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Crim. P. 12(B)(v) . . . . . . . . . . . . . . . .  13

N.Y. Penal Law § 110.00 . . . . . . . . . . . . . . . . .  42

N.Y. Penal Law § 120.10 . . . . . . . . . . . . . . . . .  48

N.Y. Penal Law § 125.25 . . . . . . . . . . . . . . . . .  48

4 C. Torcia, <u>Wharton's Criminal Law</u>,
  § 743, p. 572 (14th ed. 1981)) . . . . . . . . . . . . . .  42

R. Perkins & R. Boyce, <u>Criminal Law</u> 637 (3d ed. 1982) . . . .  42

W. LaFave & A. Scott, <u>Criminal Law</u> 428-29 (1972) . . . . . .  42

**<u>United States Sentencing Guidelines</u>**

U.S.S.G. § 2A2.2(a) . . . . . . . . . . . . . . . . . 23, 29

U.S.S.G. § 2A2.1 . . . . . . . . . . . . . . 3, 28, 33, 41, 44

U.S.S.G. § 2A2.1(a) . . . . . . . . . . . . . . . . . . 18

U.S.S.G. § 2A2.1(a)(1) . . . . . . . . . . . . . . . 30, 40

U.S.S.G. § 2A2.2 . . . . . . . . . . . . . . 2, 3, 33, 40, 41

U.S.S.G. § 2A2.2(b)(1) . . . . . . . . . . . . . . . 18, 23

U.S.S.G. § 2A2.2(b)(2)(A) . . . . . . . . . . . . . . . . 23

U.S.S.G. § 2A2.2(b)(3) . . . . . . . . . . . . . . . . . 23

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . <u>passim</u>

U.S.S.G. § 3D1.1(b)(1) . . . . . . . . . . . . . . . . 18

U.S.S.G. § 3D1.4 . . . . . . . . . . . . . . . . . . . 23

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . <u>passim</u>

U.S.S.G. § 3E1.1(a) . . . . . . . . . . . . . . . 19, 28, 37

U.S.S.G. § 3E1.1(b) . . . . . . . . . . . . . . . . 19, 37

_____

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 23-7352-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

FRANK JAMES,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

**BRIEF FOR DEFENDANT-APPELLANT FRANK JAMES**
_____

**<u>Jurisdictional Statement Pursuant to Fed. R. App. P. 28(a)</u>**

Frank James appeals from a judgment of the United States District Court for the Eastern District of New York (Honorable William F. Kuntz), rendered on October 5, 2023. A notice of appeal was timely filed on October 11, 2023. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court had jurisdiction under 18 U.S.C. § 3231.

**<u>Questions Presented</u>**

In April 2022, Frank James, then a 62-year-old man tormented by a lifelong struggle with Schizophrenia and paranoia, committed a terrible crime in a New York City subway car, shooting ten people. No one died. So, he never faced the death penalty. He pleaded guilty to an eleven-count indictment and received ten sentences of life imprisonment —— the maximum sentence for convictions under 18 U.S.C. § 1992(a)(7).

In determining that James's Sentencing Guidelines' offense level was level 43 -- resulting in a range of life imprisonment, even for someone Criminal History Category I like James -- the court added two-levels on the grounds James committed "perjury," and thus obstructed justice under Guidelines §3C1.1), because, during his guilty plea allocution, he said he had intended to cause serious bodily injury to the victims, which was sufficient to establish the intent-element of 18 U.S.C. § 1992(a)(7) —— which criminalizes the commission of acts done "with the intent to cause" <u>either</u> "death or serious bodily injury to any person" within the mass transit system —— but that he didn't have the intent to murder. Additionally, based on the same statement at the guilty plea allocution, the court denied James any offense-level reduction for acceptance of responsibility, under Guidelines § 3E1.1.

Absent this 5-point downward swing in James's offense level,

2

his Guidelines range would have been 382 to 447 months'
imprisonment. The court also determined that the applicable
Guideline was §2A2.1 (Assault with Intent Commit Murder), rather
than the Guideline for Aggravated Assault, §2A2.2, which provided
a lower base offense level.

Questions 1 to 3:

Did the district court impose a procedurally unreasonable
sentence by: (1) imposing an obstruction-of-justice enhancement,
under Guidelines § 3C1.1, because, during the guilty plea, a
mentally ill defendant stated he intended to cause serious
physical injury to people -- which the Government, during the
allocution stated, "satisfies the elements for his intent" -- but
he didn't say that he subjectively intended to kill; (2) denying
Appellant any offense-level reduction for accepting
responsibility, under § 3C1.1 —- after he timely pleaded guilty
—— based on his statement concerning his subjective intent; and
(3) applying the Guideline §2A2.1, which applies to an "Assault
with Intent Commit Murder," rather than the Guideline for
Aggravated Assault, §2A2.2, which provides a lower base offense
level?

Question 4:

Should Appellant's motion to dismiss the indictment have
been granted by the district court, because: (i) 18 U.S.C. §
1992(a)(7) does not extend to a crime committed on a subway car;

3

(ii) the aggravating-penalty provision of § 1992(b) — which increased the maximum penalty from 20 years' to life imprisonment — does not apply to § 1992(a)(7), an issue pending before this Court in <u>United States v. Ullah</u>, No. 21-1058-cr, heard on Apr. 27, 2022; and (iii) a violation of § 1992(a)(7) is not a categorical crime of violence within the meaning of 18 U.S.C. § 924(c), an issue pending before the Court in <u>Ullah</u>, <u>id.</u>

## **Statement of the Case**

Frank James appeals from a judgment of the United States District Court for the Eastern District of New York, convicting him, upon his guilty plea, of ten counts of perpetrating an attack against a mass transportation system,[1] by discharging a firearm on subway car, wounding ten people; and one count of discharging a firearm during a crime of violence.[2] A.78-84 (superseding indictment); A.91-139 (guilty plea).[3]

He was sentenced to life imprisonment on the ten counts charging a violation of § 1992(a)(7). Each life sentence was imposed concurrently to the other, and consecutively to a 10-year prison sentence for the § 924(c) firearms count.

On appeal, this Court continued the Federal Defenders of New

_____

[1] 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (b)(2), (c)(1), and (c)(2).

[2] 18 U.S.C. § 924(c)(1)(A)(iii).

[3] "A." references are to the pages of the Appendix that is being filed in this appeal.

4

York, Inc., Appeals Bureau, as counsel on appeal to Frank James under the Criminal Justice Act.

**Statement of Facts**

I.   **Frank James's history of mental illness**

Mr. James is a 64-year-old African-American man who "suffers from Schizophrenia" and from "organic brain damage/dysfunction" as well. <u>See</u> Forensic Psychiatric Evaluation of Frank James, prepared by Dr. Bhushan S. Agharkar, MD, dated Sept. 14, 2023 ("Psychiatric Eval'n"), at 8.[4] James "has suffered from [Schizophrenia] for close to five decades without adequate mental health treatment." <u>See</u> "Neuropsychological Assessment Report," prepared by Clinical Psychologist Marlyne K. Israelian, Ph.D, dated September 12, 2023 ("Neuropsych. Assessment"), at 26;[5] <u>see</u> Presentence Report ("PSR") at 33, ¶168 ("According to the defendant's medical records from the MDC .... [h]e was diagnosed with Unspecified Schizophrenia and Other Psychotic Disorder.")[6]

---

[4] The Forensic Psychiatric Evaluation of Dr. Agharkar MD, was submitted to the district court as Exhibit B to defense counsel's sentencing letter of September 18, 2023. Dr. Agharkar's report was filed on the public record (in the district court) as Document 81-2, and is included in the Appendix (filed in this appeal) at A.164-79.

[5] The Neuropsychological Assessment of Frank James, prepared by Clinical Psychologist Marlyne K. Israelian, was submitted to the district court as Document 81-3 of the district court record, which was attached as Exhibit C to defense counsel's sentencing letter of September 18, 2023.

[6] References to "PSR" are to the Presentence Report prepared by the Probation Office on June 29, 2023. An Addendum to

Members of Mr. James's family, two of his four sisters and a paternal uncle, also "have a significant history of psychotic illness." <u>See</u> Neuropsych. Assessment at 4. His sister Susan "has spent most of her life in and out of mental hospitals." <u>Id.</u> Another sister, Barbara, "was diagnosed with and medicated most of her life for Schizophrenia and Bipolar Disorder. She was living in a New York City shelter when she passed away in 2020." <u>Id.</u> And a "paternal uncle suffered similarly from mental illness and lived in a group home most of his life." <u>Id.</u> Frank James was "born with the genetic propensity for a severe [] mental illness[.]" <u>Id.</u> at 27.

Frank James's "psychopathology" is primarily "paranoid and persecutory in nature." Neuropsych. Assessment at 26. "Mr. James's psychotic symptoms are consistent with Schizophrenia." Psych. Eval'n at 9. "[S]ince age 15[,]" he has "suffered from paranoid and persecutory delusion." Neuropsych. Assessment at 26; <u>id.</u> ("What is particularly shocking is that some of the persecutory ideas that began 48 years ago continue to this day with tragic consequences for Mr. James ... and the community at large.").

Throughout James's life, therefore, he was incapable of maintaining social relationships and had difficulty keeping a

---

the Report was filed on September 22, 2023. The PSR and its Addendum are being transmitted to this Court under seal.

job. Neuropsych. Assessment at 27; see PSR at 30, ¶158 ("the
defendant has never married and has no children .... and
described himself as being socially isolated"); id. at 33, ¶170
("he was socially isolated and did not have close relationships
with anyone.")

Starting in his teens, James began showing classic "symptoms
of hallucinations and paranoid delusions," which is the typical
age for "'first break' psychosis." Psychiatric Eval'n at 9. "Mr.
James has exhibited a broad range of long-term behavioral,
mental, and emotional disturbances beginning at, or about, 15
years of age[.]" Neuropsych. Assessment at 27.

"[R]eared in a low-income household in the South Bronx,"
James started elementary school a few "months after his mother's
death," "when he was 5 years old." PSR at 31, ¶157; Neuropsych.
Assessment at 4. "[D]uring his early years, he had friends at
school." But "[s]tarting around his junior high school years, he
had significant difficulty making and keeping friends."
Neuropsych. Assessment at 4-5.

As he "advanced in school, he increasingly struggled both
emotionally and socially." Id. at 5. In 1975, when he was in the
9th grade, at Dewitt Clinton High School, he had his first
encounter with the mental health system: "a guidance counselor at
his high school referred [him] to a psychologist at Lincoln
Hospital" and he was "prescribed a potent combination of

7

antipsychotic medications, namely Stelazine and Thorazine." Id.
at 5; see PSR at 33, ¶165. As noted by Marlyne Israelian, Ph.D.,
who performed the Neuropsychological Assessment of James: "He was
only 15 years old at the time and must have been struggling with
significant psychotic symptoms in addition to depression,
anxiety, and difficulties relating to his peers in order to
warrant this potent cocktail." Neuropsych. Assessment at 5.
"Stelazine and Thorazine" were typically prescribed "to manage
symptoms of schizophrenia and schizoaffective disorder such as
delusions and hallucination." Id. James "admitted to 'seeing
hallucinations,' talking to himself and feeling very agitated
during this time." Id.

When James "was at most 18-years old," he had another mental
health crisis: "a train conductor at a subway station was so
frightened and disturbed by Mr. James's behavior that [the
conductor] resorted to striking him on the head with a stick to
subdue him." Id. at 5. James was "admitted to Lincoln Hospital"
and treated "with Haldol, another antipsychotic medication." Id.

Frank James left high school in 1975, but obtained "his
General Educational Development (GED) diploma from Argus
Community High School, an alternative educational program in the
Bronx in 1979" (PSR, ¶¶156, 173 id., ¶156) and decided to go to
college, attending Morris Brown College in Atlanta, Georgia. See
Neuropsych. Assessment at 5. He started taking "college

prerequisite classes" and had a dorm room to himself. <u>Id.</u> But "[d]isturbances in mood, behavior, and perception began as soon as he was assigned a roommate[.]" <u>Id.</u> "[H]e experienced another serious psychotic episode" and was "admitted to the psychiatric unit at Grady Memorial Hospital in Atlanta," and "treated with antipsychotic medication and released after a 2-week inpatient stay." <u>Id.</u> at 5-6.

James returned to New York and lived with his father. Neuropsych. Assessment at 6. But "[h]is psychotic symptoms persisted," and he came "to believe that people were talking to him through the local radio station." <u>Id.</u> In August 1980 — at age 21 — he "set a kerosene fire in the radio station" and was "incarcerated for...one year." <u>Id.</u> "[I]n 1980, while in custody at Riker's Island Correctional Facility,...he tried to hang himself." PSR at 27, 33, ¶¶136, 166; <u>see</u> Neuropsych. Assessment at 6.

This was James's first arrest. <u>See</u> PSR at 27, 30, ¶¶136, 153. More than 40 years later, in 2022, he would have no felony convictions and be in Criminal History Category I. <u>See</u> PSR at 27-30.

"In the 1980s, Mr. James found some transient relief through a day treatment program at Lincoln Hospital[,]" which he attended five days a week and "found some stability." A.148. In 1983, he became a machinist, and "[f]rom approximately 1983 to the early

1990s," he worked as a machinist "in different locations including at Lucent Technologies in Parsippany, New Jersey." PSR at 35, ¶178. But he had a long commute, and could not attend his day treatment and also work. A.148. "His paranoia crept back in until it overcame him and he was fired. He found other machinist jobs, but he continually felt ridiculed and targeted by his coworkers.... He was fired from that job, too, and every other machinist job he tried to work. By 1991, he was homeless and drinking heavily." A.148.

In March 1993, James was hospitalized at St. Vincent Hospital. A.148, 217.[7] In October 1993, "he was diagnosed with chronic paranoid schizophrenia," with signs of major depression, auditory hallucinations, and paranoid delusions. A.148, 218. He "was referred to SVTN-CHMC, now Montefiore Medical Center. He reported psychiatric history ...coinciding with alcohol abuse, which 'led him to seek and enter therapy.'" A.148, 230-32.

In 1997, James enrolled in Bridgeway House, a residential psychiatric facility in Elizabeth, New Jersey. A.148; PSR at 35, ¶177. From 1997 to 1998, he was a client; from 1999 to 2006, he was an employee in the maintenance department. A.148; PSR at 35, ¶177. This was the longest time he had held a job but, in his view, "he experienced relentless harassment and racism. Staff

---

[7] 37 pages of Frank James's SSDI records were attached to counsel's sentencing letter as Exhibit D. See Document 81-4.

spread rumors about him that he became convinced follow him to this day. He left Bridgeway and left the New York/New Jersey region, cycling out of clinics, hospitals, and homeless shelters in Philadelphia, PA; Wilmington, DE; Miami and Jacksonville, FL; Columbus, OH; Chicago, IL; and Milwaukee, WI." A.148.

In Miami, in about 2010, he became "an inpatient" at a hospital. PSR at 33, ¶167. "He then went to Columbus, Ohio, where he lived for approximately five years." PSR at 32, ¶159. "[S]ince 2010, [he] has been classified as disabled and received a monthly Social Security Disability Insurance (SSDI) benefit." PSR at 33, ¶167.

He "moved to Milwaukee, Wisconsin, where he lived from approximately 2018 to 2022." PSR at 33, ¶167. Id. "The defendant's last known residence was a rental apartment in Milwaukee, Wisconsin. Prior to the instant offense, he had no fixed address and his last location ... was a short-term rental in Philadelphia, Pennsylvania." Id.

In 2008, James "became obsessed with Doomsday preparation videos on YouTube and started making preparations for the end of the world." Psychiatric Eval'n at 4. His own "YouTube videos contained conspiratorial and paranoid themes regarding Doomsday prophecies." Id. at 9.

Frank James thus "lived a solitary and transient life, moving alone from one place to another and receiving medical

treatment only in the most extreme circumstances. Mr. James received intermittent emergency care." Neuropsych. Assessment at 28. He did not receive adequate mental health treatment. Id.

"For a chronic and incurable illness, treatment depends heavily on continuity of care. In order for there to be such continuity, information about a patient's symptoms and functioning must be accurately and appropriately communicated from one mental health provider or setting to another." Id. Unfortunately, James, "like many other people suffering from Schizophrenia, do[es] not have someone in [his] li[fe] to consistently communicate [his] medical history from one doctor and/or setting to another." Id. People like James "mostly find themselves in treatment settings when they are at their worst and thereby unlikely to be able to meaningfully participate in treatment planning." Id.

## II.   **The offense, indictment, and motion to dismiss the indictment**

"On April 12, 2022, at approximately 8:26 a.m., the defendant fired approximately 32 shots on a crowded N train subway car in Brooklyn, New York." PSR at 5, ¶17.

"[W]earing a yellow hard hat and orange reflective jacket," James told "passengers who tried to sit next to him that the seats were wet, causing passengers to move away" from him. Id., ¶18. He then set off a smoke grenade that filled the subway car with smoke, causing people "to flee to the far end of the subway

12

car" and he "began firing his semi-automatic Glock 17 pistol at the passengers." Id., ¶19. "At the time the defendant started shooting, the train was in between stations and then teporarily stalled[.]" Id. He fired 32 shots before his gun jammed, and 17 of the bullets struck 10 people. PSR at 5-6, ¶¶19-20. James escaped in the ensuing confusion. After law enforcement identified him as the shooter, he turned himself in to police the next day ("April 13") by calling "NYPD crime stoppers." PSR at 6-7.

On May 6, 2022, a two-count indictment was initially filed in the Eastern District of New York, charging Frank James with one count of attacking a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2); and one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(A)(iii). A.18-23.

Appellant moved to dismiss the indictment for failure to state a federal offense, under Fed.R.Crim.P.12(B)(v), because: (i) 18 U.S.C. § 1992(a)(7) does not extend to a crime committed on a subway car; (ii) the aggravating offense of § 1992(b) —— which increased the maximum penalty from 20 years to life —— does not apply § 1992(a)(7); and (iii) a violation of § 1992(a)(7) is not a categorical crime of violence within the meaning of 18

13

U.S.C. § 924(c). A.24-39. The Government opposed the motion.
A.40-67. The court denied the motion in an order issued on
December 21, 2022. A.13.

On December 16, 2022, a Superseding Indictment was filed,
charging Frank James with ten counts of attacking a mass
transportation system, based on the ten gunshot victims, and one
count of using a firearm during a crime of violence. A.78-84.

## III. **The guilty plea**

### A. The Government's pre-plea letter concerning the elements of the crime and the Guidelines range

On December 29, 2022, the Government submitted a letter to
the court "[b]ecause the defendant ha[d] indicated that he
intends to plead guilty to the eleven counts of the superseding
indictment without a plea agreement[.]" A.85. The Government said
it was providing the court "the elements of each offense ... and
the government's current estimate of the defendant's advisory
sentencing range under the United States Sentencing
Guidelines[.]" A.85-88.

The Government set forth the "[e]lements of the [c]harged
[c]rimes" (A.85-87), starting with Counts One through Ten, the
Government stated that the intent required for these offenses
(under 18 U.S.C. §§ 1992(a)(7), 1992(b)(l)) was that James
committed an act, including the use of a dangerous weapon, "with
the intent to cause death or serious bodily injury to each of the
ten gunshot victims[.]" A.86. It added: "The term 'serious bodily

14

injury' means bodily injury which involves— (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty. See 18 U.S.C. § 1365(h)(3)." A.86 (footnote 1).

It also explained the elements of Count Eleven (18 U.S.C. § 924(c)) and gave the statutory minimum and maximum penalties for all eleven offenses. A.87-88.

Regarding the Sentencing Guidelines range, the Government stated that if Frank James accepted responsibility, the "Guidelines will advise the imposition of a sentence within a total range of 382 to 447 months' imprisonment, assuming the defendant falls within Criminal History Category I." A.88-89. It also said that "the government intends to seek an above-Guidelines sentence at the time of the defendant's sentencing." A.98.

B.   The guilty plea allocution

On January 3, 2023, Frank James pleaded guilty before Honorable William F. Kuntz without a plea agreement. A.90-139.

The court questioned James under oath. A.92-94. It read aloud the eleven counts of the superseding indictment. A.97, 99-107. And it read Government's letter "dated December 29ᵗʰ of 2022." A.107. Reading the letter's discussion of the first element of § 1992(a)(7), the intent element, the court said:

15

> First, the defendant committed an act, including the use of a dangerous weapon, with the intent to cause death of serious bodily injury to each of the ten gunshot victims.
>
> Footnote 1: The term "serious bodily injury" means bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impaiment of the function of a bodily member, organ, or mental faculty. See Title 18, United States Code, Section 1365(h)(3).

A.110.

The court ultimately asked James how he pleaded to each of the eleven counts; he replied, "Guilty." The court then asked James to "briefly" describe what he "did to commit the offenses charged" in the superseding indictment. A.130-33. James said:

> On April 4th -- April 12th, 2022, I Frank Robert James, traveled from Philadelphia, Pennsylvania to New York City, New York.
>
> In New York, I got upon an N train, which is part of the New York City subway mass transportation -- New York City subway, a mass transportation provider. I went to the Kings Highway train station located in Brooklyn, New York and got on the subway train that was carrying passengers.
>
> While I was on the train, I started shooting a firearm. My intention was to cause serious bodily injury to the people on the train. And although it was not my intention to cause death, I was fully aware of the fact that a death or deaths could occur as a result of my discharging a firearm in such an enclosed space in the subway car. I understand the people listed in the indictment were the individuals injured on the train from when I discharged the firearm.
>
> I intend to make a complete statement expressing my remorse at the time of my sentencing.

16

A.133.

The court noted James's statement that he did not intend to cause death, and asked the lawyers for their views. A.134. The government stated that at a trial, it would have proven that he intended "to kill the individuals on the subway car, including the ten victims that he shot," but "the government believes the defendant's allocution satisfies the elements for his intent." A.134, 135.

The court then asked for defense counsel's view. A.135. Counsel stated: "Yes, we agree with the government that the allocution is satisfactory. The statute is pled in the disjunctive, requiring either the intent to kill or the intent to cause serious bodily injury, and Mr. James has successfully allocuted to the same." Id.

The court asked the Government whether there was "anything further the government would like the Court to ask the defendant at this time?" A.135. The Government did not ask the court to inquire further into James's intent. A.136.[8]

The court accepted the guilty plea, finding that James's plea was given knowingly and voluntarily and that "there is, moreover, a factual basis for the acceptance of his plea." A.137-

---

[8] It simply asked the court to establish that James fired the gun knowingly, the interstate commerce element, and that the train was "on a subway track and in an MTA tunnel[.]" A.135-36. Counsel stipulated to these facts.

17

38.

## IV. **The Presentence Report ("PSR")**

A.   The offense level calculation

The PSR concluded that Counts One through Ten cannot be grouped, under the Guidelines' multi-count grouping rules of U.S.S.G. §§ 3D1.1-3D1.4, because each count concerned a different victim and a different harm. U.S.S.G. § 3D1.1(b)(1).

For each of the ten counts, the PSR determined that the applicable Guideline was § 2A2.1(a), titled "Assault with Intent to Commit Murder; Attempted Murder," which provides a base offense level of 33.

A special offense characteristic of 4 or 2 levels was added based on the extent of the victims' injuries: 4 levels if the victim suffered "permanent or life-threatening bodily injury," U.S.S.G. § 2A2.1(b)(1)(A); 2 levels for "serious bodily injury." Id. § 2A2.1(b)(1)(B). See PSR at 21-26.

The PSR then added a two-level enhancement for obstruction of justice, under U.S.S.G. § 3C1.1, asserting that James committed "perjury" "[d]uring his plea allocution," because "the defendant admitted to shooting his firearm on the subway but falsely claimed that his 'intention was to cause serious bodily injury to the people on the train' and that it was 'not [his] intention to cause death.'" PSR at 20, ¶63.

The PSR then denied James a downward adjustment (of 3

18

levels) for acceptance of responsibility, under U.S.S.G. § 3E1.1(a), (b), because he had obstructed justice. PSR at 20, ¶64.

Thus, for Counts One through Ten, the PSR calculated the offense level as follows. The base offense level was 33. For Counts One, Five, Seven, Eight, and Ten, 4 levels were added for permanent or life threatening injuries. PSR at 21, 23-25, ¶¶68, 92, 104, 110, 122.[9] To this offense level of 37, the 2-level obstruction enhancement was included, resulting in an adjusted offense of 39. PSR at 21, 23-26, ¶¶71-72, 95-96, 107-08, 113-14, 125-26.

For the remaining five counts (charging an attack on mass transit) -- Counts Two, Three, Four, Six, and Nine -- 2 levels were added (to base offense level 33), because the victims sustained "serious bodily injury." See PSR at 21-23, 25, ¶¶74, ¶80, ¶86, ¶98, ¶116.[10] To this offense level of 35, the 2-level enhancement for obstruction of justice was added, resulting in an adjusted offense of 37. PSR at 22-25, ¶¶77-78, 83-84, 89-90, 110-02, 119-20.

For Count Eleven, the § 924(c) firearms count, "the guideline sentence is the term of imprisonment required by

---

[9] See PSR at 21, ¶68 (Count One); id. at 23, ¶92 (Count Five); id. at 24, ¶104 (Count Seven); id., ¶110 (Count Eight); and id. at 25, ¶122 (Count Ten).

[10] See PSR at 21, ¶74 (Count Two); id. at 22, ¶80 (Count Three); id., ¶86 (Count Four); id. at 23, ¶98 (Count Six); and id. at 25, ¶116 (Count Nine).

statute, which is 10 years." PSR at 26, ¶127.

The PSR concluded that the total offense level was level 43. PSR at 27,, ¶134. Under § 3D1.4, one unit is assigned to the group with the highest offense level, which under its calculation was level 39. And one additional unit is assigned for each group that is "equally serious or from 1 to 4 levels less serious" than the group with the highest offense level, with a maximum increase of 5 levels. See PSR at 26, ¶¶ 128-130. The PSR thus added 5 levels to the highest offense level (level 39), resulting in a combined offense level of 44. Id. at 27, ¶131.

So, for Counts One through Ten, the PSR calculated the offense level as level 44. Because level 44 exceeds the maximum level in the Guidelines Sentencing Table, the applicable offense level is 43. PSR at 28, ¶134.

B.   Frank James's Criminal History

The PSR determined that Frank James's criminal record results "in a subtotal criminal history score of zero." PSR at 30, ¶149.

As noted, his first arrest occurred in August 1980, at age 21, when he "started to believe that people were talking to him through the local radio station" and "set a kerosene fire in the radio station." Neuropsych. Assessment at 6; see PSR at 27, 33, ¶¶136, 166 (He was convicted of "Reckless Endangerment 2nd Degree (Misdemeanor)").

20

From age 21 (in 1980) to age 48 (in December 2007), James was arrested for various other misdemeanor offenses. His December 2007 disorderly conduct arrest was his last encounter with the criminal justice system until this case. PSR at 30.

After August 1980, James's next arrest was eleven years later, in December 1991; at age 32, he was arrested, for a misdemeanor trespassing offense in Fairfield, New Jersey, and was fined $125. PSR at 27, ¶137. Next, in August 1992 (at age 33), he was convicted of a misdemeanor larceny, in Jersey City, New Jersey, and sentenced to 7 days in jail. Id., ¶138.

In September 1992 (at age 33), he was convicted of attempted petit larceny in New York County, and sentenced to "Time Served" on the day after the arrest, for damaging "pay phones" by banging on them with a hammer. Id. at 28, ¶139. He subsequently sustained several other misdemeanor convictions, in New York County, for conduct involving "a public telephone." In these New York County cases, he was charged with misdemeanor criminal tampering for either using a metal to remove money from "a public telephone" or damaging the coin slot of a public telephone. PSR at 28-30, ¶¶140-41, 143, 145, 147. These offenses (involving pay phones) occurred at the following times: in November 1992 ("[a]ge 33"); January 1993; June 1993; February 1994 ("[a]ge 34"); and December 1998 ("[a]ge 39"). See Id., ¶¶140-41, 143, 145, 147. He received

21

sentences either of a conditional discharge[11] or of 30 days in jail.[12]

Mr. James also had a February 1993 conviction in the Bronx for a fare beat. PSR at 28, ¶142. He had another fare beat in August 1993, in New York County, for which he received a conditional discharge. PSR at 29, ¶144. He sustained a misdemeanor harassment conviction, in Newark, New Jersey, for which he received a probationary sentence of one year. Id., ¶146. And finally, in December 2007 (at "[a]ge 48"), he sustained a disorderly conduct conviction, in Hoboken, New Jersey, for which he was required to pay a "$172 Assessment." PSR at 30, ¶148.

Thus, Frank James had a "criminal history score of zero," which establishes a criminal history category of I." Id., ¶149, 150.

C.   The Sentencing Guidelines range

"Based upon a total offense level of 43 and a criminal history category of I, the guideline imprisonment range is life. Additionally, Count Eleven requires 10 years of imprisonment consecutive to any other counts." PSR at 36, ¶187.

Without the 5-levels resulting from the PSR's application of the (2 level) obstruction enhancement and its denial of a downward adjustment (of 3 levels) for acceptance of

---

[11]PSR at 28-30, ¶¶141, 145, 147.

[12]Id., ¶¶140, 143.

22

responsibility, the offense level would have been a level 39. At Criminal History Category ("CHC") I and an offense level 39, the Sentencing Guidelines range would be 262 to 327 months' imprisonment. With the mandatory 120-month consecutive sentence required by Count Eleven, the Guidelines range would be 382 to 447 months' imprisonment (or 31.83 years to 37.25 years): the range provided in the Government's pre-guilty-plea-allocution letter, dated December 29, 2022. See A.88-89 (stating that with a 3-level reduction for accepting responsibility, the "Guidelines will advise the imposition of a sentence within a total range of 382 to 447 months' imprisonment").

Defense counsel, however, argued that the applicable Guideline for Counts One to Ten should be Aggravated Assault: U.S.S.G. § 2A2.2(a). Application of the Aggravated Assault Guideline, together with enhancements, would result in a combined adjusted offense level of 31, rather than the level 43 found by the PSR. The base offense level for Aggravated Assault is level 14. See Document 68 of Docket Sheet, "Defense Guidelines Estimate," dated Jan. 3, 2023. Twelve additional levels would apply: 2 levels for more than minimal planning (§ 2A2.2(b)(1)); 5 levels for the discharge of a firearm (§ 2A2.2(b)(2)(A)); and 5 levels for Serious, permanent, or life-threatening bodily injury (§ 2A2.2(b)(3)). To this adjusted offense level of 26, five levels would be added under the grouping rules of U.S.S.G. §

23

3D1.4, yielding an offense level 31. Minus 3 levels for acceptance of responsibility (§ 3E1.1), the total adjusted offense level would be 28. At CHC I, the Guidelines Range for Counts One through Ten would be 78 to 97 months. With the additional 120-month consecutive sentence imposed on Count Eleven, the total Guidelines range (for all eleven counts) would be 198 to 217 months' imprisonment (or 16 and one-half to 18.08 years). Id. at 1-3.

## V.   **The sentencing submissions**

### A.   The Government's submission

The Government argued that the applicable Sentencing Guidelines was 2A2.1 ("Assault with Intent to Commit Murder: Attempted Murder"), which provides a base offense level 33. A.302.

It contended that Frank James's "intent to commit murder" is shown by the fact he chose a crowded subway car during the morning rush hour, "which maximized the number of potential victims." A.305. And before James started shooting, he "set off a smoke grenade," which caused passengers to flee to the opposite end of the subway car, increasing "the chance that the defendant's bullets would hit passengers." Id. "Moreover, setting off the smoke grenade made it almost impossible for the defendant to aim to injure instead of aim to kill. Without seeing where he was shooting, the defendant could not possibly have calibrated

his shots to only shoot people where it would cause 'serious bodily injury' as opposed to death, as the defendant now argues. Had the defendant only wanted to cause 'serious bodily injury,' as he claims, he would not have set off the smoke grenade which prevented him from aiming to harm instead of aiming to kill." Id.

It also cited James's use of a "semi-automatic Glock 17 pistol" that was capable of firing "multiple bullets in rapid succession." A.305. It added: "While each individual bullet fired requires an intentional trigger pull -- and thus a separate decision to fire the gun each time -- the Glock 17 is specifically designed to carry out rapid fire, making it uniquely designed to shoot more people in a short amount of time." Id. James also used a large capacity magazine with the handgun "and had two additional large capacity magazines with him, one found on the floor and one in his backpack" — each "magazine held 18 cartridges (unfired bullets)[.]" Id. And he used "Underwood 9mm +P+ caliber solid copper cartridges" which cause severe wounds. Id.

The Government further claimed that James's "social media posts and YouTube videos" "demonstrate a clear desire to kill people." A.306.

It cited an "April 2017" Facebook post from James that "included an image of a deceased individual with a 'dead on arrival' ('DOA') tag tied to the individual's foot" with a text

25

saying, "This is ONLY thing I'm trying to label you." A.306. "In
another Facebook post ... from February 2017," James posted that
"sticks and stones may break my bones and your words my[sic] even
hurt me but you better know this you son of a b***h these 9mm
bullets will kill you." A.307.

After citing these two posts from 2017, it next cited two
Facebook posts from 2021 that it described as follows: "In posts
from May 2021 and July 2021, the defendant posted the message:
'have you ever wondered why you were alive? Well so have I and I
can't think of one good reason your ass should be alive either.'"
A.307.

In none of these Facebook posts was there a mention of any
intention to attack random people on a subway train or on any
public transportation system.

The same is true of the Facebook posts from 2022 that the
Government cited. It stated: "on February 17, March 12, and April
9, 2022 ... the defendant repeatedly posted an image of a person
laying dead on the ground with law enforcement cones identifying
the location of fired bullets. The text on the image stated:
'it's never to[sic] late to say f*** you.'" A.307. And it stated
that "on February 20, March 7, and March 11, 2022, the defendant
posted that 'they say the pen is mightier than the sword. I say
the bullet is mightier than both [of] them.'" A.307.

According to the Government, "the defendant's Facebook posts

26

over time and immediately before the shooting show a clear intent to kill —- not seriously injure -- people." A.307.

The Government also claimed that videos that James "posted on YouTube" showed "his intent to kill people" because the videos "discuss[] his desire to forcibly reduce the population." A.308. "For example:

- In a video dated February 22, 2020 and titled 'My Friend Mr. Molotov,' the defendant stated that 'there are too many humans on the planet who don't need to be here.'

- In a video dated May 15, 2020 and titled 'Comin to Get Ya,' the defendant stated that 'a factory reset should take place.' He went on to warn people to 'watch your bak. You better gear up. Get a gun if you can get a gun. You can't kill every motherfu**** but you can get two or three before they get you and yours. Start preparing.'

- In a video dated October 25, 2021 and titled 'A Blast from the Past,' the defendant repeatedly stated that the 'dying time ... has to happen, for the possibly for change' and stated that the dying time is here.'"

Id. (alterations in original). The Government also stated that James posted YouTube videos praising "Ted Bundy" and the "Bind Torture Kill ('BTK') Killer[.]" Id.

In addition, the Government argued that James had been planning the attack since 2017, because a couple of items he used in the attack had been purchased back then. And it contended that the trajectory of the bullets fired evidenced the intent to kill.

27

A.308-09. The Government, thus asked the court to "use the attempted murder Guidelines provision to calculate the defendant's sentencing range. See U.S.S.G. § 2A2.1[.]" A.309.

In addition, the Government contended that because "the evidence overwhelmingly proves that the defendant intended to kill his victims[,]" "a mandatory two-level enhancement under U.S.S.G. § 3C1.1 applies to the defendant's Guidelines calculation because ..., at his plea allocution, he falsely claimed that he did not intend to kill his victims and intended only to cause serious bodily injury." A.310. Although it acknowledged that "the defendant's plea allocution was factually sufficient to meet the elements of the charges," it contended that the court should nevertheless apply the obstruction enhancement. A.310-11.

And it contended that the court should decline to apply the three-level reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b) based on the same statement during the plea allocution. A.311-14.

B.   <u>Defense counsel's submission</u>

Counsel objected to the PSR's application of a two-point enhancement for obstruction of justice based on its assertion "that Mr. James's plea allocution as to his own state of mind at the time of the attack was perjurious." A.143. Counsel noted that, at the guilty plea, the prosecutor had stated: "'the

28

government believes the defendant's allocution satisfies the
elements for his intent.'" A.144, 145. And James's allocution,
counsel pointed out, "was consistent with the disjunctive
elements of the charged offense. 18 U.S.C. §1997(a)(7)
(criminalizing the commission of 'an act, including the use of a
dangerous weapon, with the intent to cause death or serious
bodily injury to any person' within the mass transit system)."
Id.

In addition, counsel argued that the PSR erroneously
withheld the three-point adjustment for acceptance of
responsibility, "despite [James's] clearly and timely doing so."
A.145. James's guilty plea "spared at least ten victims from
testifying as to the harm they suffered, as well as a massive
expenditure of the government's resources in proving its case
with forensic, technological, physical, and circumstantial
evidence. [James] began accepting responsibility when he returned
from Newark, New Jersey to Manhattan, PSR ¶ 26, to peacefully
turn himself in to law enforcement. PSR ¶ 27." A.145. Counsel
argued that the "early plea to ten major terrorism charges, along
with a consecutive ten-year 924(c) count, without a plea
agreement, and with life exposure, is extraordinary." Id.

Finally, counsel argued that the applicable Sentencing
Guideline, for determining the base offense levels for Counts One
to Ten, should be Aggravated Assault of U.S.S.G. § 2A2.2(a),

29

which provides a base offense level of 14. Counsel noted that the
Guidelines Manual provides three potentially applicable base
offense levels: "U.S.S.G. §§ 2A2.1(a)(1) (Assault with Intent to
Commit First Degree Murder); 2A2.1(a)(2) (Assault with intent to
Commit Any Other Murder); and 2A2.2 (Aggravated Assault)." A.141.
Counsel argued that the evidence did not demonstrate that James
acted with the specific intent kill any of the ten victims, but
was more consistent with his having acted with "extreme and even
depraved indifference to human life," by "unloading a pistol in a
crowded subway car, causing a range of injuries, some permanent
and life-threatening." A.143. The victims were trapped in a
subway car with "no egress[,]" yet "he did not shoot even one
person in the head, or in the chest. Half [of] his rounds struck
no one at all. Of the 17 bullets that hit people, many hit
victims in the knees, PSR ¶¶ 48, 50; the buttocks, PSR ¶¶ 49, 54;
the bottom of the foot, PSR ¶ 51; the hand, PSR ¶ 56, or caused a
slight graze wound. PSR ¶ 55." Id. Counsel noted: "In a society
where, sadly, we learn nearly every day that mass shooters who
intend to kill readily achieve their goals, it is far more likely
that Mr. James lacked that specific intent than that he simply
failed in his mission, 32 times." Id.

## VI. **The sentencing**

The sentencing occurred on October 5, 2023. A.320-427.

The court concluded that Frank James had obstructed justice

30

through his guilty plea allocution. <u>See</u> Sentencing Transcript

("S.") at 5-9, 78-80; A.324-28, 397-99. The court stated:

> Mr. James, I have carefully considered the parties' arguments and the evidence in this case. This Court finds your claim during your plea allocution that you did not intend to kill the victims of your crime was a false claim. This Court also finds that you made this statement intentionally for the purpose of receiving a lesser sentence and that your false statement was material because it pertained to an element of the offense.
>
> Therefore, this Court finds you willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution and/or sentencing of the instant offense of conviction, and the obstructive conduct related to your offense and conviction.
>
> Consistent with this determination, two levels are added pursuant to the Guidelines Section 3C1.1 to each of Counts 1 through 10.

S.8-9; A.327-29.  Later in the proceedings, the court would

similarly stated:

> [T]his Court finds the Defendant's claims regarding his criminal intent were false. The Court further finds this Defendant intentionally made these false statements regarding his criminal intent in an effort to receive a lesser sentence. And, finally, the Court determines this Defendant's statements were material because they pertained to an element of the offense. Accordingly, the Court finds the Defendant has obstructed and/or impeded the administration of justice, and consistent with this finding, a two-level enhancement to Counts One through Ten is warranted pursuant to the Guidelines Section 3C1.1.

S.80; A.399.

The court also applied section 2A2.1 (the Guideline for

31

intentional murder), making the base offense level 33, and added a 4 or 2 level special-offense characteristics increase based on the victim's injury. And it did not grant a reduction for acceptance of responsibility. S.7-15, 78-81; A.327-34.

Thus, the court agreed with the PSR and the Government and calculated the offense level to be 43. The court imposed maximum sentences of life imprisonment on Counts One to Ten, plus a mandatory consecutive 10 years on Count Eleven. S.80-102; A.399-421.

## Summary of Argument

This Court reviews sentences for procedural and substantive "unreasonableness," United States v. Booker, 543 U.S. 220, 261 (2005) (Remedial Op., Breyer, J.), which "amounts to review for abuse of discretion." United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) (en banc) (citing, among other authorities, Gall, 552 U.S. at 46; Kimbrough, 552 U.S. at 111). A court commits procedural error when it makes a mistake in its Guidelines calculation or rests its sentence on a clearly erroneous finding of fact or a mistake of law. See, e.g., Cavera, 550 F.3d at 190; United States v. Verkhoglyad, 516 F.3d 122, 127 (2d Cir. 2008). A sentencing judge "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall, 552 U.S. at 49 (2007) (citing Rita v. United States, 551 U.S. 338, 347-48 (2007)).

32

In this case, three errors occurred in the court's calculation of Appellant's Sentencing Guidelines range. <u>First</u>, it imposed an obstruction-of-justice enhancement, under Guidelines § 3C1.1, because, during the guilty plea, this mentally ill defendant, in relating his subjective intent, said he intended to cause serious physical injury to people -- which satisfied the intent element of 18 U.S.C. § 1992(a)(7) -- but he didn't say that he subjectively intended to kill. <u>Second</u>, the court denied Appellant any offense-level reduction for accepting responsibility, under § 3C1.1, based on this same statement at the guilty plea, even though Appelllant had timely pleaded guilty. And <u>third</u>, the court applied the Guideline §2A2.1, which applies to an "Assault with Intent Commit Murder," rather than the Guideline for Aggravated Assault, §2A2.2, which provides a lower base offense level. Appellant contends these errors require a remand for resentencing.

Additionally, Appellant contends that his motion to dismiss the indictment should have been granted. Hence, all eleven counts should be dismissed. He argues that 18 U.S.C. § 1992(a)(7) does not extend to a crime committed on a subway car; that the aggravated penalty provided in § 1992(b) —— which increased the maximum penalty from a 20-year prison sentence to one of life imprisonment —— does not apply to § 1992(a)(7); and that a violation of § 1992(a)(7) is not a categorical crime of violence

33

within the meaning of 18 U.S.C. § 924(c).

**Point I**

**The district court should not have imposed an obstruction enhancement based on the defendant's guilty plea allocution in which he admitted to the elements of the offenses, but related that he subjectively believed he did not intend to commit murder.**

**A.    The standard of review**

"The imposition of an obstruction-of-justice enhancement is subject to a mixed standard of review." United States v. Brown, 321 F.3d 347, 351 (2d Cir. 2003). While findings of fact are reviewed for clear error, see United States v. Woodard, 239 F.3d 159, 161 (2d Cir. 2001), a district court's "ruling that those facts 'constitute obstruction or attempted obstruction under the Guidelines ... is a matter of legal interpretation and is to be reviewed de novo.'" Brown, 31 F.3d at 351 (quoting United States v. Cassiliano, 137 F.3d 742, 745 (2d Cir. 1998)).

**B.    The court should not have imposed the obstruction enhancement.**

The Guidelines provide for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." U.S.S.G. § 3C1.1. Conduct warranting the enhancement includes "committing, suborning, or

34

attempting to suborn perjury." Id., comment. (n.4(B)).

Regarding such conduct, however, the Sentencing Commission warns that courts should take great care to avoid the possibility that it is being used to "punish a defendant for the exercise of a constitutional right." Id., comment. (n.2). A "defendant's denial of guilt . . . is not a basis for application of this provision." Rather, when "applying this provision in respect to alleged false testimony or statements by the defendant," "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." Id.

This concern originates in United States v. Dunnigan, 507 U.S. 87, 96-97 (1993), which upheld the constitutionality of the enhancement but recognized its potential to chill a defendant's right to testify. A court must be aware that "an accused may give inaccurate testimony due to confusion, mistake, or faulty memory," and thus must not impose the enhancement whenever a defendant's testimony is rejected by the factfinder. Id. at 95. The enhancement is appropriate only when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Id. at 94.

Following Dunnigan, this Court has held that "before

35

applying an obstruction enhancement based on perjury, the
sentencing court must find by a preponderance of the evidence
that the defendant (1) willfully (2) and materially (3) committed
perjury, which is (a) the intentional (b) giving of false
testimony (c) as to a material matter." United States v. Agudelo,
414 F.3d 345, 349 (2d Cir. 2005). The court must thus find not
only that the defendant perjured himself, but that "the perjury
had been committed with the specific intent to obstruct justice."
United States v. Canova, 412 F.3d 331, 357 (2d Cir. 2005).

Here, in light of the fact that the guilty plea allocution
satisfied the elements of all eleven counts of the superseding
indictment, and in light of James's more than 50 years' suffering
from mental illness, it cannot be said that the record
demonstrates that the defendant, by his guilty plea, willfully
attempted to obstruct justice on a material matter. A person who
testifies truthfully does not commit perjury, "even if his belief
was irrational or mistaken." United States v. Catano-Alzate, 62
F.3d 41, 43 (2d Cir. 1995). As counsel noted, at allocution,
James "spoke to his subjective understanding of what he meant to
do" at the time "he fired his weapon[.]" A. 144. James's
allocution established the elements of the crime. As counsel
noted, "at the time of the plea, to elucidate his mindset at the
time of the offense," James "explain[ed] that 'I was fully aware
of the fact that a death or deaths could occur as a result of my

36

discharging a firearm in such an enclosed space in the subway car,' risks he clearly disregarded." A. 144. The allocution established the elements of  18 U.S.C. § 1992(a)(7), which criminalizes the commission of acts done "with the intent to cause" either "death or serious bodily injury to any person" within the mass transit system. Id. §1992(a)(7). Accordingly, Frank James should not have received two-level enhancement for obstruction of justice on Counts One to Ten.

### Point II

**The district court erred in denying the defendant any reduction whatsoever, under Sentencing Guidelines § 3E1.1, after he timely accepted responsibility by pleading guilty to all of the offenses in the superseding indictment.**

The Guidelines authorize a two-step decrease in offense level if a defendant "clearly demonstrates acceptance of responsibility." U.S.S.G. § 3E1.1(a). An additional one-step decrease is available, on motion of the government, where the defendant's offense level without any acceptance-of-responsibility credit is at least 16 and his "timely" notification of his intent to plead guilty saves the government from preparing for trial. Id. § 3E1.1(b); see United States v. Singh, 877 F.3d 107, 119-20 (2d Cir. 2017). "'[T]he paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits the conduct comprising

37

the offense or offenses of conviction.'" Id. at 120 (quoting
United States v. Kumar, 617 F.3d 612, 637 (2d Cir. 2010)). In
deciding whether to grant acceptance-of-responsibility credit,
the district court is to consider, inter alia, whether the
defendant "truthfully admit[ted] the conduct comprising the
offense(s) of conviction, and truthfully admit[ted] or not
falsely den[ied] any additional relevant conduct." U.S.S.G §
3E1.1, Cmt. Note 1(A). A defendant is not required, however, "to
volunteer, or affirmatively admit, relevant conduct beyond the
offense of conviction" to qualify for the reduction. Id.

Government contended James did not accept responsibility
because he committed "perjury" at the guilty plea in relating his
subject intent; that he "lie[d] under oath to influence a
sentence"; and that he "intentional[ly] refus[ed] to take full
responsibility for his attempted murder[.]". A. 313.

Given Frank James's life-long struggles with mental illness,
what he subjectively believed, at the time he reflected on his
past conduct during the guilty plea, is unknowable. Again, "even
if [a person's] belief was irrational" or mistaken, the person
has not committed perjury if, in their mind, they "testifie[d]
truthfully." Catano-Alzate, 62 F.3d at 43.

And as counsel noted, there was objective evidence to
support the inference that James acted with extreme indifference
to human life, not a specific intent to kill: "the lack of any

38

deaths, under these circumstances; the location of the injuries suffered; the number of shots fired wildly, hitting no one[.]" A. 144.

Denying James acceptance points, after he pleaded guilty to the indictment, means he got nothing for giving up his constitutional right to a jury trial. The denial increased his Guidelines range to life imprisonment on ten of the eleven counts, and he was sentenced to ten life terms. Thus, as counsel pointed out, "[w]ithout acceptance points —— in a case where [the defendant] unequivocally admitted his conduct, and met every element of the statute, as the government agreed —— [James's] guilty plea is equivalent for Guidelines purposes as having had, and lost, a trial." A. 146. But James had spared the Government, the court, and prospective jurors of the burden of a trial, "absolv[ing] the government of meeting its burden of proof at trial" and "spar[ing] at least ten victims from testifying as to the harm they suffered[.]" A. 146. James thus should have been accorded acceptance points for his guilty plea.

### Point III

**The court should have applied Guidelines § 2A2.2, governing an aggravated assault, which provides a base offense level of 14, rather than the Guideline for assault with the intent to commit intentional murder (of § 2A2.1, requiring a base offense level of 33).**

Frank James pleaded guilty to ten counts of violating 18 U.S.C. § 1992(a)(7), which criminalizes the commission of "an act, including the use of a dangerous weapon, with the intent to cause death **or** serious bodily injury to any person" within a mass transit system. Id. § 1992(a)(7) (emphasis added).

The Guidelines Manual provides three potentially applicable base offense levels: U.S.S.G. §§ 2A2.1(a)(1) (assault with intent to commit "first degree murder"); 2A2.1(a)(2) (assault with intent to commit any other murder); and 2A2.2 (Aggravated Assault).

The application of 2A2.1(a), whether subsection (1) or (2), requires an intent to commit murder. A person intends to commit first degree murder when his conduct would meet the elements of 18 U.S.C. § 1111, requiring the unlawful killing of a human being with malice aforethought, to encompass "willful, deliberate, malicious, and premeditated killing." "Any other murder is murder in the second degree." Id.

Killings lacking the mens rea for first degree murder are

40

not attempted murders. Attempted manslaughter, for example, is covered by 2A2.2. See Commentary, Background to U.S.S.G. § 2A2.1. So too are assaults with the intention to cause bodily injuries, including those that result in permanent or life-threatening ones. App. Note 1, U.S.S.G. § 2A2.2. Courts determine the relevant "reason and judgment of the defendant" "at the time of the [attempted] killing." United States v. Velazquez, 246 F.3d 204, 210 (2d Cir. 2001).

The Guidelines define "first degree murder" as "conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111." U.S.S.G. § 2A2.1, application note 1. Section 1111, in turn, defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. A "willful, deliberate, malicious, and premeditated killing," or a killing "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree." Id. "Any other murder is murder in the second degree." Id.

Attempts to kill are punishable under 18 U.S.C. § 1113. Although there are no definitions in § 1113, this Circuit has held that "a specific intent to kill" is an "essential element" of an attempted murder conviction. United States v. Kwong, 14 F.3d 189, 194 (2d Cir. 1994). See also Braxton v. United States,

41

500 U.S. 344, 349 (1991) (Defendant "must have taken a substantial step towards that crime, and must also have had the requisite <u>mens</u> <u>rea</u>.").

"'Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.'" <u>Braxton</u>, 500 U.S. at 351 n.* (quoting 4 C. Torcia, <u>Wharton's Criminal Law</u>, § 743, p. 572 (14th ed. 1981)); <u>see also</u> R. Perkins & R. Boyce, <u>Criminal Law</u> 637 (3d ed. 1982); W. LaFave & A. Scott, <u>Criminal Law</u> 428-29 (1972). This Court has likewise held that "a specific intent to kill is an essential element of [attempted murder]. The fact that a deadly weapon was used does not <u>ipso</u> <u>facto</u> prove the specific intent." <u>Kwong</u>, 14 F.3d at 194 (reversing conviction under <u>Braxton</u> because district court erroneously charged jury that attempted murder could be proven based on reckless and wanton conduct).

<u>Braxton</u>'s rule -- that the crime of attempted murder, unlike the crime of actual murder, requires the specific intent to kill -- applies to the federal crime of attempted murder of a federal official, 18 U.S.C. § 1114, <u>see</u> <u>Braxton</u>, 500 U.S. at 349-51; to the federal crime of attempted murder generally, 18 U.S.C. § 1113, <u>see</u> <u>Kwong</u>, 14 F.3d at 194-95; and to the New York offense of attempted murder in the second degree, N.Y. Penal Law §§

42

110.00 and 125.25.[13]

Thus, for either attempted-murder Guideline to apply, the evidence had to demonstrate that when James fired the weapon, he did so with the specific intent of killing the victim. Extreme indifference to human life falls short. And because James was charged separately with, and pleaded guilty to, a charged offense for each named victim, application of the attempted-murder Guideline to each count requires a specific intent to kill the named victim. Counsel noted that James "did not shoot even one person in the head, or in the chest. Half his rounds struck no one at all. Of the 17 bullets that hit people, many hit victims in the knees; the buttocks; the bottom of the foot; the hand; or caused a slight graze wound." A. 143. "In a society where, sadly, we learn nearly every day that mass shooters who intend to kill readily achieve their goals, it is far more likely that Mr. James lacked that specific intent than that he simply failed in his mission, 32 times." A. 143.

Instead, "[w]ith extreme and even depraved indifference to

---

[13] See, e.g., Nancie D. v. New York Central Mutual Fire Ins. Co., 600 N.Y.S.2d 472, 474 (N.Y. App. Div. 2d Dep't 1993) (attempted murder in the second degree "necessarily includes as an essential element the specific intent to kill"); People v. Greiner, 549 N.Y.S.2d 831, 833 (N.Y. App. Div. 3d Dep't 1989) (attempted murder in the second degree requires proof that the defendant had the "specific intent to cause death"); People v. Terry, 479 N.Y.S.2d 278, 279-80 (N.Y. App. Div. 2d Dep't 1984) (one cannot be found guilty of attempted murder in the second degree based upon reckless conduct).

human life, Mr. James unloaded a pistol in a crowded subway car, causing a range of injuries, some permanent and life-threatening. The aggravated assault Guideline, together with enhancements, applies to each of Counts One through Ten." A. 143. Accordingly, the Guidelines for attempted murder, under U.S.S.G. § 2A2.1, should not have applied. The sentence should be vacated and the matter remanded for resentencing.

### Point IV

**Appellant's motion to dismiss the indictment should have been granted.**[14]

## I.   18 U.S.C. § 1992(a)(7) does not extend to a shooting committed on a subway car.

The plain language of section (a)(7) limits its reach to an "act" committed on specified property used to support the operation of the subways; the property specified does not include subway cars themselves. It punishes whoever "commits an act, including the use of a dangerous weapon, with intent to cause death or serious bodily injury to any person who is on property described in subparagraphs (A) or (B) of paragraph (4)." The property described in Paragraphs 4 (A) and (B) includes only any:

(A) Tunnel, bridge, viaduct, trestle, track, electromagnetic guideway, signal, station, depot, warehouse, terminal, or any other structure, property, or appurtenance used in the operation of, or in support

---

[14]Standard of review: "The denial of a motion to dismiss the indictment is reviewed de novo." United States v. Yannotti, 541 F.3d 112, 121 (2d Cir. 2008).

44

of the operation of, a railroad carrier ... or

(B) garage, terminal, structure, track, electromagnetic guideway, supply, or facility used in the operation of, or in support of the operation of, a mass transportation vehicle.

18 U.S.C. § 1992(4)(A) & (B).

The property described does not include "a mass transportation vehicle" or "railroad on-track equipment": these are included in other sections of § 1992 proscribing attacks in or against such vehicles. "In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Kmart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).

Other sections of 1992 specifically proscribe acts in, upon or near a "mass transportation vehicle" or "railroad on-track equipment." This indicates that when Congress intended to proscribe acts on such vehicles —— such as a subway or train car —— it said so. Subsection (a)(1), of 1992, punishes anyone who "wrecks, derails, sets fire to, or disables railroad on-track equipment or a mass transportation vehicle." Subsection (a)(2) punishes anyone who "places any biological agent or toxin, destructive substance, or destructive device, in upon or near railroad on-track equipment or a mass transportation vehicle withintent to endanger the safety of any person, or with a reckless disregard for the safety of human life." Subsections

45

(a)(3) and (a)(4), on the other hand, punish, respectively, anyone who "places or releases a hazardous material or biological agent or toxin on or near" or "sets fire to, undermines, makes unworkable, unusable, or hazardous to work on or use, or places any biological agent or toxin, destructive substance, or destructive device in upon or near" any of the property described in paragraphs (A) and (B), which do not include a "mass transportation vehicle or on-track railroad equipment."

Indeed, subsections (a)(2) and (a)(3) punish the same type of conduct -- "placing a biological agent or toxin" some place, but on two distinct types of property: for subsection (a)(2), the place is "in, upon, or near railroad on-track equipment or a mass transportation vehicle"; but for Subsection (a)(3), it's "on or near any property described in subparagraphs (A) or (B) of paragraph (4)." Therefore, when Congress intended to prohibit conduct in both subway cars and stations, terminals, etc., it said so. Subsection (a)(7) includes only acts committed on the property described in paragraphs (A) and (B), not those on "mass transportation vehicles" or railroad on-track equipment. <u>See</u> <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (where "Congress includes particular language in one section of a statute but omits it in another section of the same Act," it's "presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

46

The structure of section 1992 supports this plain textual reading. Congress enacted a legislative scheme proscribing certain acts committed in or against train and subway infrastructure like stations, tracks and terminals; and other acts committed in or against rail and subway cars: "railroad on-track equipment or a mass transportation vehicle." Unlike subsections (a)(1) or (a)(2), Subsection (a)(7) does not include an act committed in (or upon or near) a "mass transportation vehicle," only an act committed on the types of infrastructure property described in paragraphs (4)(A) or (B). Neither the plain text nor the structure of the statute supports a reading of Subsection (a)(7) that extends to a shooting in a subway car.

The indictment filed against James alleged that he committed an "act" in violation of subsection (a)(7) to one or more persons by discharging a firearm at passengers on a subway car that was itself located "on" a track and in a structure and facility to try to fit within Subsection (a)(7). But if Congress had intended Subsection (a)(7) to include any violent act committed on a subway car, it would have included that by including a "mass transportation vehicle" — a phrase used several times in its description of the kind of property included. It did not. This exclusion is presumed intentional. <u>See Russello</u>, 464 U.S. at 23.

The legislative history of § 1992 confirms its purpose to punish attacks on mass transportation systems, and not federalize

any random act of violence on a subway car.[15] It was enacted in 1940 as a train-wrecking statute, punishing "whoever shall willfully derail, disable, or wreck any train, engine, motor unit, or car used, operated, or employed in interstate commerce by any railroad," or "whoever shall willfully set fire to, or place any explosive substance on or near, or undermine any tunnel, bridge, viaduct, trestle, track, signal, station, depot, warehouse, terminal, or any other way, structure, or property used in the operation of any such railroad in interstate or foreign commerce," or otherwise make any such property "unworkable or unusable or hazardous to use."

A different statute, 18 U.S.C. § 1991, was enacted at the same time, making it a felony to enter a train to commit a murder or robbery, and a misdemeanor to enter a train with intent to commit any unlawful act upon a passenger, engineer, conductor, fireman or brakeman. This statute, which remains the same today, does not contain the interstate commerce element and is limited to such acts committed within the exclusive jurisdiction of the United States, not those within state jurisdictions. Id. Entering a New York City subway car to commit a murder, or an assault with a deadly weapon, is a New York State offense. See N.Y. Penal Law §§ 125.25; 120.10 et seq.

---

[15] A shooting on a subway car is a classic state crime. See e.g., People v. (Bernard) Goetz, 68 N.Y.2d 96, 506 N.Y.S.2d 18 (1989).

48

In 2001, the Patriot Act added § 1993, captioned "Terrorist attacks and other acts of violence against mass transportation systems," which proscribed attacks on mass transportation vehicles (wrecking, setting fire to, placing a destructive device in, upon, or near); attacks on certain categories of property used in support of mass transportation vehicles (garages, terminals, structures, etc.); and attacks against signal systems and drivers and dispatchers. 18 U.S.C. § 1993 (Oct. 26, 2001).

It included subsection (6), proscribing "an act, including the use of a dangerous weapon, with intent to cause death or serious bodily injury to an employee or passenger of a mass transportation provider or any other person while any of the foregoing are on the property of a mass transportation provider." In 2006, Congress repealed § 1993 and amended § 1992 to incorporate, in modified form, the offenses proscribed in § 1993. The offense in section § 1993(a)(6) became § 1992 (a)(7), but Congress specifically narrowed the categories of proscribed behavior, limiting the act to one committed on the specified property-categories of paragraphs (4)(A) and (4)(B), rather than the broader "on the property of a mass transportation provider." Clearly, if Congress intended this provision to apply to any act committed on any property of a mass transportation provider, it already had the language and would have left it in place. Instead, it limited the act to one against a person on the

49

specified types of property, which did not include a mass transportation vehicle.

In sum, the plain language of § 1992(a)(7), the structure of the entire statute, and its legislative history confirm that this federal offense does not extend to an assault on a subway car: a state law offense. And if any ambiguity exists about the provision's scope, the rule of lenity requires that the statute be construed in the defendant's favor. See <u>United States v. Santos</u>, 553 U.S. 507, 514 (2020).

## II. The Aggravated Offense of § 1992(b) Does Not Apply to § 1992(a)(7).

The aggravated offense of § 1992(b)(1) dramatically increases the maximum sentence from 20 years, § 1992(a), to life imprisonment for anyone who attacks a "mass transportation vehicle" or "railroad on-track equipment" that is carrying a passenger or employee. It plainly applies only to those offenses that involve an attack on such a vehicle; Subsection (a)(7) is not among them.

Section 1992(b) provides an aggravated punishment for "anyone who commits an offense under subsection (a) in a circumstance in which the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense." This applies, by its terms, to those offenses in Subsection (a) that involve an attack on a mass transportation vehicle: for example, Subsection (a)(1), which

50

punishes someone who "wrecks, derails, sets fire to, or disables **railroad on-track equipment or a mass transportation vehicle**"; Subsection (a)(2), which prohibits "plac[ing] ... a destructive device **in, upon or near railroad on track equipment or a mass transportation vehicle**"; Subsection (a)(4)(B), prohibiting "placing ... a destructive device in, upon or near ... any garage, terminal, structure, track, electromagnetic guideway ... used in the operation of, or in support of the operation of, a mass transportation vehicle," "**with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck a mass transportation vehicle**"; and Subsection (a)(4)(A), prohibiting the same conduct with respect to property used in support or operation of a railroad carrier (emphasis added). These statutory sections punish attacks on a mass transportation vehicle, <u>e.g.</u>, a train or subway car. And subsection (b) punishes more severely an attack against such a vehicle that contains passengers or employees.

Subsection (a)(7), however, punishes "any act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person" who is on property described in paragraph (4)(A) or (B). That property includes, as relevant here, a "garage, terminal, structure, track, electromagnetic guideway, supply, or facility used in the operation of, or in support of the operation of a mass transportation vehicle[.]" §

51

(4)(B). This subsection thus punishes any act intended to kill or seriously injure anyone who is on the property of infrastructure supporting a subway, train or bus terminal, station, or facility. Unlike subsections (a)(2) and (a)(4)(B), it does not prohibit an attack that takes place on a mass transportation vehicle or railroad on-track equipment. Subsection (b)'s aggravator for committing the crime "in a circumstance in which" "the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee," does not relate to any such vehicle or equipment in subsection (a)(7) because (a)(7) does not include such vehicles. Therefore, the aggravator logically does not apply to violations of Subsection (a)(7).

## III. A violation of section 1992(a)(7) is not categorically a crime of violence under 18 U.S.C. § 924(c).

An offense qualifies as a crime of violence only if it satisfies § 924(c)(3)(A)'s force clause; that is, only if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." United States v. Davis, 139 S. Ct. 2319 (2019). That determination is made using the categorical approach, id., in which "the facts of a given case are irrelevant" and only the statutory elements are considered. Borden v. United States, 141 S. Ct. 1817, 1825 (2019); Descamps v. United States, 570 U.S. 254 (2013). "Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute."

52

Hylton v. Sessions, 897 F.3d 57, 60 (2d Cir. 2018). If the statute sweeps more broadly than the force clause, a conviction under that statute cannot count as a predicate, regardless of the defendant's actual conduct. Descamps, 570 U.S. at 261.

Section § 1992(a)(7) is not a crime of violence under § 924(c) because it prohibits the commission of any "act" with intent to cause death or serious physical injury to "any person" within a terminal, track, facility, etc., and does not require the use, attempted use of force, or threatened use of force against "the person or property of another." See 18 U.S.C. § 924(c).

First, the "act" need not be against the person or property **of another**, as required by the force clause. And the intent to cause injury or death is to "any person" in the station, which can include the defendant himself: a defendant attempting suicide in a subway or train station, by throwing himself on the track, down the stairs, or over a bannister, with intent to kill himself would be guilty, without using force against the person or property of another. E.g., Portee v. United States, 941 F.3d 263 (7th Cir. 2019) (Indiana felony intimidation not an ACCA crime of violence because it can be committed by an armed suspect who is threatening to kill himself in order to avoid arrest).

The Supreme Court made clear in Borden that the phrase "against the person or property of another" is critical to the

53

force clause. 141 S. Ct. at 1825, 1827. If the offense does not require the use of force against another's person or property, it does not satisfy the force clause. The offense described in Subsection (a)(7) does not require the use of force against another person or another person's property.

This is true whether or not an attempted suicide has ever been prosecuted under this statute. In United States v. Taylor, 596 U.S. 845 (2022), the Supreme Court rejected the Government's argument that the defendant had to show that particular conduct, broader than what the force clause required, had actually been prosecuted under the statute at issue. The Court explained that the only question is whether the language of the statute includes conduct broader than that requiring the use of force against another: "Put aside the oddity of placing a burden on the defendant to present empirical evidence about the government's own prosecutorial habits. Put aside, too, the practical challenges such a burden would present in a world where most cases end in plea agreements, and not all of those cases make their way into easily accessible commercial databases." Taylor, 596 U.S. at 857. (citations omitted). "An even more fundamental" "problem lurks here": "To determine whether a federal felony qualifies as a crime of violence, § 924(c)(3)(A) doesn't ask whether the crime is **sometimes** or even **usually** associated with communicated threats of force (or, for that matter, with the

54

actual or attempted use of force). It asks whether the government must prove, as an **element** of its case, the use, attempted use, or threatened use of force." 596 U.S. at 857-58 (emphasis in original).

Section 1992(a)(7) extends to any act committed with intent to cause physical injury to "any person," which includes the defendant himself. It does not require "as an element" the use or threatened use of force "against the person of another."

Second, even if 1992(a)(7) were limited to an act committed with intent to cause death or injury to "another" -- which it is not -- the "act" can be anything, including simply walking into a subway station or terminal with intent to hurt someone. To violate section 1992(a)(7) the "act" could be anything, including travel in interstate commerce or simply walking into station with violent intent. It could also include the "act" of walking away from a distraught companion who says he will jump on the tracks. An employee with a duty to keep the station safe could maliciously fail to do so -- by committing the "act" of going home without clearing the ice, for example -- with the intent that people be seriously injured. Because these acts do not necessarily use, threaten, or attempt to use force, the offense would not qualify as a crime of violence. Again, the fact that no one has been prosecuted for these acts under the statute is irrelevant, following the Supreme Court's abrogation of the

55

"realistic probability" test. <u>Taylor</u>, 596 U.S. at 858-59.

### **Conclusion**

For the reasons stated in Points I, II, and III, the sentence should be vacated, and the case remanded for resentencing. For those stated in Point IV, this Court should reverse the district court, and order the indictment dismissed.

Dated:    New York, New York
              February 1, 2024

                      Respectfully submitted,

                      FEDERAL DEFENDERS OF NEW YORK, INC.
                        APPEALS BUREAU

                      By:    *Darrell Fields*
                      **DARRELL FIELDS**
                      Attorney for Defendant-Appellant
                        **FRANK JAMES**
                      52 Duane Street, 10th Floor
                      New York, New York 10007
                      Tel.: (212) 417-8742

---

### CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by ACMS on the United States Attorney/E.D.N.Y.; Attention: **SARAH WINIK, ESQ.**, Assistant United States Attorney, 271 Cadman Plaza East, Brooklyn, NY 11201.

Dated:     New York, New York
           February 1, 2024

*Darrell Fields*
**DARRELL FIELDS**
Assistant Federal Defender

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

    1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

        this brief contains 12,596 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

    2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a monospaced typeface using **Corel WordPerfect X6** with **12 characters per inch in courier new** type style.

Attorney for Appellant **FRANK JAMES**

Dated:    New York, New York
           February 1, 2024

                *Darrell Fields*
                _____
                **DARRELL FIELDS**
                Assistant Federal Defender