# 23-7352

*To Be Argued By*:
SARA K. WINIK

# United States Court of Appeals

## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

FRANK JAMES,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

SUSAN CORKERY,
SARA K. WINIK,
ELLEN H. SISE,
    *Assistant United States Attorneys,*
        *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................iv

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS .................................................................. 4

    I.     Overview ................................................................. 4

    II.    James's Mass Shooting ........................................... 4

        A.    The Attack ................................................. 4

        B.    Evidence James Committed the Attack ......................... 8

        C.    James's Significant Preparation and
Planning of the Attack ............................................... 9

        D.    James's Intent to Commit Murder ............................. 12

    III.    Procedural History ................................................. 16

    IV.    The Presentence Investigation Report ................................. 19

    V.    Sentencing ......................................................... 21

        A.    The Guidelines Calculation ......................................... 22

        B.    Section 3553(a) Factors ............................................... 23

SUMMARY OF ARGUMENT .................................................... 26

ARGUMENT ..................................................................... 28

POINT ONE - THE DISTRICT COURT CORRECTLY
        APPLIED THE OBSTRUCTION OF
        JUSTICE ENHANCEMENT ......................................... 28

    I.    The Law ................................................................. 28

A.    Standard of Review ...................................................... 28

B.    Enhancement for Obstruction of Justice
Under U.S.S.G. § 3C1.1 ............................... 28

II.    Discussion ................................................................... 30

POINT TWO - THE DISTRICT COURT CORRECTLY
DENIED JAMES AN ACCEPTANCE OF
RESPONSBILITY REDUCTION BASED
ON JAMES'S FALSE STATEMENTS ............................ 34

I.    The Law ....................................................................... 34

A.    Standard of Review ...................................................... 34

B.    Reduction for Acceptance of Responsibility
Under U.S.S.G. § 3E1.1 ................................ 34

II.    Discussion ................................................................... 36

POINT THREE - THE DISTRICT COURT APPLIED THE
CORRECT GUIDELINES PROVISION
FOR ASSAULT WITH INTENT TO
COMMIT MURDER ................................................... 40

I.    The Law ....................................................................... 40

A.    Standard of Review ...................................................... 40

B.    Base Offense Level §§ 2A1.1(a)(1) (Assault
with Intent to Commit Murder; Attempted
Murder) and 2A2.2 (Aggravated Assault) .................. 40

II.    Discussion ................................................................... 41

POINT FOUR - JAMES WAIVED THE RIGHT TO
CHALLENGE THE SUPERSEDING
INDICTMENT AND HIS ARGUMENTS
ARE MERITLESS ....................................................... 44

iii

I. The Law ........................................................................ 44

    A. Standard of Review ............................................ 44

    B. 18 U.S.C. § 1992 ................................................ 45

    C. "Crime of Violence" Under Section 924(c) .................. 48

II. Discussion .................................................................... 49

    A. James Waived His Right to Challenge the
       Issues Raised in His Motion to Dismiss the
       Indictment .................................................... 49

    B. Section 1992(a)(7) Criminalizes James's
       Conduct ........................................................ 53

    C. The Sentencing Enhancement in Section
       1992(b)(1) Applies to Section 1992(a)(7) ..................... 60

    D. A Violation of Section 1992(a)(7) is a Crime
       of Violence Under Section 924(c) ............................ 62

CONCLUSION ..................................................................... 70

# TABLE OF AUTHORITIES

Page(s)

## CASES

Alvarado-Linares v. United States,
    44 F.4th 1334 (11th Cir. 2022) ........................................................... 67, 68

Conn. Nat'l Bank v. Germain,
    503 U.S. 249 (1992) ............................................................................. 62

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
    447 U.S. 102 (1980) ............................................................................. 45

Erlenbaugh v. United States,
    409 U.S. 239 (1972) ............................................................................. 66

Gibbons v. Bristol-Myers Squibb Co.,
    919 F.3d 699 (2d Cir. 2019) ................................................................. 59

Hayle v. United States,
    815 F.2d 879 (2d Cir. 1987) ................................................................. 50

Johnson v. United States,
    576 U.S. 591 (2015) ............................................................................. 57

Lamar v. United States,
    240 U.S. 60 (1916) .......................................................................... 51, 52

Leocal v. Ashcroft,
    543 U.S. 1 (2004) ................................................................................. 57

Moncrieffe v. Holder,
    569 U.S. 184 (2013) ............................................................................. 49

Nken v. Holder,
    556 U.S. 418 (2009) ............................................................................. 59

v

United States v. Abad,
    514 F.3d 271 (2d Cir. 2008)....................................................44

United States v. Albertini,
    472 U.S. 675 (1985) .......................................................61-62

United States v. Brown,
    321 F.3d 347 (2d Cir. 2003)....................................................28

United States v. Calderon,
    243 F.3d 587 (2d Cir. 2001)....................................................50

United States v. Cassiliano,
    137 F.3d 742 (2d Cir. 1998)....................................................28

United States v. Cotton,
    535 U.S. 625 (2002) .......................................................51, 52

United States v. Davis,
    139 S. Ct. 2319 (2019) ........................................................49

United States v. Delossantos,
    498 F. App'x 92 (2d Cir. 2012) .............................................30-31

United States v. Fatico,
    604 F.2d 1053 (2d Cir. 1979)...................................................21

United States v. Frias,
    521 F.3d 229 (2d Cir. 2008)....................................................52

United States v. Garcia,
    339 F.3d 116 (2d Cir. 2003)....................................................50

United States v. Gotti,
    459 F.3d 296 (2d Cir. 2006)....................................................40

United States v. Green,
    No. 22-800, 2023 WL 7180645 (2d Cir. Nov. 1, 2023).........................43

United States v. Hill,
    890 F.3d 51 (2d Cir. 2018).............................................49, 66, 67

United States v. Kumar,
   617 F.3d 612 (2d Cir. 2010) .......................................................35, 39 n.6

United States v. Marigin,
   66 F. App'x 266 (2d Cir. 2003) ............................................................ 29

United States v. Passley,
   No. 22-1361, 2023 WL 8921150 (2d Cir. Dec. 27, 2023) ............... 41, 43

United States v. Pena,
   751 F.3d 101 (2d Cir. 2014) .................................................................. 29

United States v. Remini,
   967 F.2d 754 (2d Cir. 1992) .................................................................. 34

United States v. Reyes,
   9 F.3d 275 (2d Cir. 1993) .........................................................35, 38, 39

United States v. Rodriguez,
   738 F. App'x 729 (2d Cir. 2018) .......................................................... 43

United States v. Rubin,
   743 F.3d 31 (2d Cir. 2014) ...................................................50 n.8, 51, 52

United States v. Scott,
   990 F.3d 94 (2d Cir. 2021) ..................................................63, 64, 68, 69

United States v. Strange,
   65 F.4th 86 (2d Cir. 2023) ..................................................................... 34

United States v. Sweeny,
   797 F. Supp. 2d 233 (E.D.N.Y. 2011),
   aff'd, 485 F. App'x 468 (2d Cir. 2012) .................................................. 32

United States v. Vilar,
   729 F.3d 62 (2d Cir. 2013) .................................................................... 44

United States v. Ward,
   148 F. App'x 17 (2d Cir. 2005) .......................................................39 n.6

United States v. White,
  543 F. App'x 563 (6th Cir. 2013) ........................................................ 44

United States v. Woodard,
  239 F.3d 159 (2d Cir. 2001) ............................................................ 28

United States v. Young,
  630 F. App'x 52 (2d Cir. 2015) ....................................................... 29

## STATUTES

18 U.S.C. § 924(c)(1)(A) .......................................................... 48, 49

18 U.S.C. § 924(c)(3)(A) .............................................................. 48

18 U.S.C. § 924(c)(3)(B) .............................................................. 49

18 U.S.C. § 1111.......................................................................... 41

18 U.S.C. § 1992 ................................................................. passim

18 U.S.C. § 1992(a)(2)................................................................. 63

18 U.S.C. § 1992(a)(4)(A) .............................................. 55, 56, 58

18 U.S.C. § 1992(a)(4)(B)............................... 46, 54, 55, 58, 60

18 U.S.C. § 1992(a)(6)................................................................. 57

18 U.S.C. § 1992(a)(7)........................................................ passim

18 U.S.C. § 1992(b)(1)........................................................ passim

18 U.S.C. § 3553(a) .......................................................... 21, 23

## RULES

Fed. R. Crim. P. 11(a)(2).................................................... 50-51

## GUIDELINES

U.S.S.G. § 2A2.1 ................................................................. passim

U.S.S.G. § 2A2.1, App. Note 1 ................................................................40-41

U.S.S.G § 2A2.2 ...........................................................................................41

U.S.S.G. § 2A2.2, App. Note 1 ...................................................................41

U.S.S.G. § 3C1.1 ................................................................................. passim

U.S.S.G. § 3C1.1, App. Note4(f) ...............................................................29

U.S.S.G. § 3E1.1 ..........................................................................................34

U.S.S.G. § 3E1.1, App. Note 1(a) ..............................................................35

U.S.S.G. § 5K2.0 .........................................................................................24

## OTHER AUTHORITY

Wayne R. LaFave, Substantive Criminal Law,
   815.6(a)(3d ed. 2018) .............................................................................64

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7352

───────────────────

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

FRANK JAMES,

<u>Defendant-Appellant</u>.

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Defendant-Appellant Frank James appeals from a judgment

entered on October 6, 2023, in the United States District Court for the

Eastern District of New York (Kuntz, J.), convicting him, after a guilty

plea, of ten counts of committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2), and one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii). The district court sentenced James to ten concurrent life sentences on the terrorist attack counts and a consecutive term of 10 years' imprisonment on the firearm count.

On appeal, James contends: (1) the district court erred in applying the obstruction of justice enhancement pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3C1.1 based on the fact that James lied at his plea allocution when he claimed he did not intend to kill his victims despite firing 32 bullets on a crowded subway car during the morning rush hour; (2) the district court erred in denying James a reduction in the Guidelines calculation for acceptance of responsibility under U.S.S.G. § 3E1.1 because he committed perjury at his plea allocution; (3) the district court erred in applying base offense level U.S.S.G. § 2A2.1 associated with attempted first degree murder; and

3

(4) the district court erred in denying James's motion to dismiss the original indictment.

As discussed below, James's claims are unavailing and should be rejected.

4

## STATEMENT OF FACTS

### I.    Overview

Frank James was charged with committing a terrorist attack against a mass transportation system and using a firearm during a crime of violence in connection with his April 12, 2022, mass shooting on a crowded N train subway car in Brooklyn, New York, that seriously injured dozens of victims.  (DE 1).[1]  On January 3, 2023, James pled guilty, without a plea agreement, to all eleven counts in the superseding indictment, but failed to take full responsibility for his carefully planned attack.  (DE 71).

### II.   James's Mass Shooting

#### A.    The Attack

At approximately 8:26 a.m. on Tuesday, April 12, 2022, during the height of the morning commute, James fired approximately 32 bullets at victims on a crowded N train subway car in Brooklyn.  (PSR ¶¶ 17, 20).

---

[1]    "A," "DE," "Br.," and "PSR" refer to, respectively, James's appendix, district court docket entries, James's brief, and the presentence report prepared by the U.S. Department of Probation ("Probation").  The PSR and its Addendum have been forwarded separately under seal.  Unless otherwise noted, all case quotations omit internal quotation marks and citations and accept alterations.

During the attack, James disguised himself as a construction or Metropolitan Transportation Authority ("MTA") worker by wearing a yellow hard hat and orange reflective jacket. (PSR ¶ 18). After entering the train car, James acted strategically to position victims at the opposite end of the subway car, creating what the ballistics expert described as a narrow "field of fire" which enabled James to shoot at a "high hit" rate and avoid the prospect that a nearby passenger would wrest the firearm away from him. (DE 84, Ex. 2 at 12-13, 16).[2] First, James told passengers who tried to sit next to him that the seats were wet, causing passengers to move away from James. (PSR ¶ 18). Then, James set off a smoke grenade which filled the train with heavy smoke and caused panicked passengers to flee to the far end of the subway car. (Id.).

Once all the passengers were packed together at the far end of the subway car, James began firing his semi-automatic Glock 17 pistol at his victims. (PSR ¶ 19). When James started shooting, the train was between stations and then temporarily stalled, leaving victims trapped, with nowhere to run or hide. (Id.). James used a semi-automatic gun

---

[2]    The expert's report is filed under seal due to the privacy interests of the victims and will be provided on request.

with an extended magazine and was able to fire bullets in rapid succession without taking time to reload. (Id.). Each bullet James fired, however, required an individual trigger pull. (Id.). Therefore, James chose to shoot 32 separate times at his defenseless victims. (DE 84, Ex. 2). It was only because James's gun eventually jammed that he stopped shooting, despite having two additional fully loaded extended magazines capable of firing an additional 36 bullets. (PSR ¶ 19).

Ultimately, at least 16 of the 32 bullets that James fired hit ten victims before James's gun jammed. (PSR ¶ 20). Notably, most of the bullets James fired were at seat height or higher, and thus aimed where victims would be expected to be sitting or standing. (PSR ¶ 20). Five of James's gunshot victims required at least one emergency surgery to treat their gunshot wounds. (PSR ¶¶ 47-58). The medical evidence showed that several of the victims likely would have died from their gunshot wounds had they not been rushed to the hospital and received life-saving surgeries. (PSR ¶¶ 47-54). Additional victims were seriously injured from smoke inhalation and in the chaotic struggle to flee from James's gunshots. (PSR ¶¶ 20, 57). Multiple victims still suffer from

7

ongoing physical and mental injuries due to the attack. (PSR ¶ 57; DE 82, Ex 1).

James's attack took place during the morning rush hour, and the subway car was full at the time James began shooting. (PSR ¶ 21). As a video taken by a passenger trapped on the train shows, many passengers were screaming for help, barely able to see because of the smoke, and bleeding heavily from wounds suffered during the attack. (DE 45-1, Ex. A).

Eventually the train pulled into the 36th Street subway station, in Sunset Park, Brooklyn, the doors opened, and the victims poured onto the platform. (PSR ¶ 22). James immediately shed his disguise to avoid detection. (PSR ¶ 24). Then, along with many other scared passengers, James boarded a train waiting across the platform and departed the scene of the attack. (Id.). A few minutes later, the train arrived at the next stop and James calmly exited the subway station without being detected. (Id.).

After exiting the subway, James fled from law enforcement, changing his clothing frequently to evade detection. (PSR ¶ 25). James traveled on public transportation from Brooklyn to the Bronx and then

to New Jersey where he spent the night before returning to Manhattan. (PSR ¶ 26).

At some point after the shooting, James purchased a burner phone which he used to closely follow the coverage of his attack while hiding from law enforcement. (PSR ¶ 27). Clearly aware that he had been identified as the shooter, James ultimately turned himself in to the police by calling New York Police Department ("NYPD") crime stoppers on April 13, 2022, the day after the shooting. (Id.). NYPD officers subsequently located and arrested James. (Id.).

B. Evidence James Committed the Attack

Evidence collected from the scene of the attack overwhelmingly showed that James committed the mass shooting. For example, James left his pistol and an ax on the subway car. (PSR ¶ 29). Records provided by the Bureau of Alcohol, Tobacco, Firearms and Explosives revealed that James lawfully purchased the pistol in Ohio in his own name. (PSR ¶ 30). DNA analysis also showed that James's DNA was on both the pistol and the ax. (PSR ¶ 29). In addition, ballistic analysis confirmed that the shell casings found on the subway car were fired by James's pistol. (PSR ¶ 30).

C.  James's Significant Preparation and Planning of the Attack

The evidence also showed that James began meticulously preparing for the April 12, 2022, attack years earlier.  (PSR ¶ 34).  For example, according to PayPal records, on or about January 8, 2017, and June 29, 2019, James purchased smoke grenades that were the same brand of smoke grenade James used during the subway attack.  (Id.).  According to records from a firearms company, on or about October 23, 2019, James purchased multiple boxes of ammunition, the same brand of ammunition that James used in the attack.  (Id.).  In addition, on or about May 17, 2021, James purchased a KwikSafety yellow hard hat, which he wore as a disguise during the attack.  (Id.).

Surveillance video and cell site data also showed that in the months leading up to the attack James took multiple trips to New York City to conduct practice runs on the subway system to prepare for the mass shooing on April 12, 2022.  (PSR ¶ 35).  For example, on March 31, 2022, James spent almost the entire day—from approximately 5:30 a.m. to 9 p.m.—riding on various subway lines, including the N train in Brooklyn, the same subway line on which James carried out the attack.

(Id.).  James took similar practice runs on the subway on April 1, 2022, and April 9, 2022.  (Id.).

James's Google search history also showed that he planned the attack in advance.  For example:

- On or about March 19, 2022, James conducted Google searches for the phrases "gun shops near Columbus Ohio" and "can I buy a gun in Ohio if I'm not a resident."

- On or on about April 1, 2022, James searched for "MTA," "New York," "transit," and "stops on the N train."

- On or about April 6, 2022, James searched for "311 kings highway Brooklyn ny," which is near where James parked before entering the subway station on April 12, 2022.

(PSR ¶ 36).

James's prolonged planning is further reflected in videos that he created and saved on his phone or posted on YouTube under the pseudonyms "profitof_doom8888" and "prophet_oftruth88."  (PSR ¶ 37).  For example, in a YouTube video that James posted July 3, 2021—about nine months before the attack—titled "Ready, Set, Go," James made the following statements:

- "I have decided on something because I believe the space and time to be able to take my time to mount the proper response to what I've gone through over the years."

- "This is all about retaliating and revenge for being attacked by motherf****s."

- "You have to put yourself in position that you're not just ready, but you're set to go, so that you get the maximum impact, maximum bang for your buck . . . Thirty years ago, I wasn't ready to respond."

- "The shit that I'm thinking about, I have a lot of moving parts to my shit, so I have to make sure they're set to go, so I have to make sure they don't fizzle out or they don't miss deploy. . . If you keep f***ing with me, one or both of us is not going to be on this earth anymore."

(PSR ¶ 37).

Similarly, in a video posted on August 5, 2019, discussing traveling to New York, James stated, "at the very least it's going to be very interesting. Let me say that. It's going to be very interesting what happens in New York with me." (PSR ¶ 38).

In addition, three months before the attack, in January 2022, James saved an audio file on his phone in which he discussed an imminent attack. (PSR ¶ 39). Speaking about his death and an unspecified big event, James made the following statements:

- "You're going to know for a fact that I'm gone, they'll be no question about that . . . when I go out of this motherf***r . . . everyone's gonna know it was me."

- "If you hear the name Frank James on the news, if
  something happens to a Frank James that's sixty-
  something years old, chances are that's me."

(Id.).  Then, as described above, James followed through with his plan

and carried out the April 12, 2022, mass shooting.

D.    James's Intent to Commit Murder

The evidence also showed James's clear intent to commit

murder when he fired 32 shots on a crowded subway car on April 12,

2022.

First, James committed the attack on a crowded subway car

during the morning rush hour which maximized the number of potential

victims.  (PSR ¶ 17).  Unlike shooting on a street where victims could run

or hide, the subway car was entirely enclosed, thus creating a "narrow

field of fire," meaning there was less area for a bullet to cover before

hitting a target.  (DE 84, Ex. 2 at 12, 16).  By carrying out the attack on

a subway car during rush hour, James intentionally increased the

probability that he would kill passengers.  (Id.).

Second, James carried out the attack to create a narrow field

of fire which made shooting passengers more effective.  (Id.).  Before

shooting, James set off a smoke grenade which caused passengers to run

to the opposite end of the train. (PSR ¶ 18-19). The smoke grenade consolidated all the passengers together, narrowing James's "field of fire" and maximizing the chance that James's bullets would hit passengers. (Id.; DE 84, Ex. 2 at 16).

Third, James fired his bullets aiming to kill. The majority of the bullets that James fired—20 out of 32 bullets—were fired at seat height or higher, which would be expected to hit victims who were seated or standing. (PSR ¶ 20). Most of the bullets that James fired went straight through the center of the train, making clear that James was not aiming at the floor or at the ceiling of the car or away from the passengers. (DE 84, Ex. at 13-16).

Fourth, James used weapons specifically designed to maximize the harm caused by each gunshot. James used a semi-automatic Glock 17 pistol which can fire multiple bullets in rapid succession, making it uniquely designed to shoot more people in a short amount of time. (PSR ¶ 19).

James also used a large capacity magazine with the pistol and had two additional large capacity magazines with him. (Id.). Each large capacity magazine held 18 cartridges (unfired bullets), which is more

14

than the standard number of cartridges a Glock 17 typically can hold, enabling James to fire more bullets without needing to reload. (DE 84, Ex. 2 at 5). Indeed, James only stopped shooting once his gun jammed, thus demonstrating his intent to fire additional shots had his gun not jammed. (PSR ¶ 19). In addition, James's choice of cartridges demonstrated his intent to kill. (PSR ¶ 34). Unlike other bullets, the cartridges James fired were specifically designed to "maximize each bullets['] damaging and/or wounding potential." (DE 84, Ex. 2 at 12).

Fifth, James's statements in social media posts and YouTube videos demonstrate a clear desire to kill people. (PSR ¶ 40). James's Facebook posts regularly included messages reflecting his intent to commit murder. (PSR ¶¶ 40, 43). In a Facebook post from April 2017—at which time James was already planning his attack—James included an image of a deceased individual with a "dead on arrival" ("DOA") tag tied to the individual's foot. The text on the image stated: "[Y]ou better know this you worthless B***H / [DOA] is ONLY thing I'm trying to label you." (PSR ¶ 40).

In a February 2017 Facebook post, James posted that "sticks and stones may break my bones and your words my [sic] even hurt me

but you better know this you son of a b***h these 9mm bullets will kill you." (PSR ¶ 43).

In posts from May 2021 and July 2021, James posted: "have you ever wondered why you were alive?  Well so have I and I can't think of one good reason your ass should be alive either."  (PSR ¶ 44).

Similarly, on February 17, March 12, and April 9, 2022—the latter of which was just three days before the attack—James repeatedly posted an image of a person lying dead on the ground with law enforcement cones identifying the location of fired bullets.  The text on the image stated: "it's never to [sic] late to say f*** you."  (PSR ¶ 45).

In addition, in the weeks leading up to the attack, James posted other messages indicating a desire to kill people.  For example, on February 20, March 7, and March 11, 2022, James posted that "they say the pen is mightier than the sword.  I say the bullet is mightier than both [of] them."  (PSR ¶ 46).

Videos that James created and posted on YouTube further reflected his intent to kill.  For example, James posted dozens of videos discussing his desires to kill and to copy serial killers, such as Ted Bundy. (PSR ¶¶ 40, 41).

III.   Procedural History

On April 14, 2022, James was arraigned on a complaint charging him with committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7) and (b)(1).  He was ordered detained at the Metropolitan Detention Center.  (DE 1, 7).[3]

On May 6, 2022, a grand jury sitting in the Eastern District of New York returned an indictment ("original indictment") charging James with one count of committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2), as well as one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii).  (A 18-24).

On November 7, 2022, James filed three substantive motions: (1) a motion to dismiss the indictment; (2) a motion to suppress a victim's identification of James and James's Mirandized statements to law

---

[3]     At no point during the pendency of the case did James request a competency hearing or contest his competency to stand trial.

enforcement; and (3) a motion to change venue to the Northern District of Illinois.  (A 25-39; DE 39-40).  The government filed its responsive briefs on December 5, 2022 (A 40-67; DE 43, 45), and James filed his reply briefs on December 19, 2022 (A 68-77; DE 60-61).

On December 16, 2022, while James's motions were pending, a grand jury sitting in the Eastern District of New York returned a superseding indictment charging James with ten counts—one for each gunshot victim—of committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2), and one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii).  (A 78-84).[4]  Notably, James never amended his motion to dismiss the original indictment to encompass the counts charged in the superseding indictment nor expressed a desire to do so in the future.

---

[4]     The charging language for the 18 U.S.C. § 1992(a)(7) counts was slightly different in the superseding indictment than in the original indictment.  For example, Counts One through Ten of the superseding indictment omitted the phrase "attempt to commit an act" and were broken out by each victim, whereas the original indictment was not victim specific.

18

Approximately one week later, and approximately two months before trial was set to begin—while James's dispositive motions were still pending—James filed a letter on the docket stating that he "wishe[d] to schedule a guilty plea to the superseding indictment" and was available to do so the first week of January 2023. (DE 64). The same day, the district court entered a docket entry scheduling a guilty plea for January 3, 2023 (DE 65), and then entered three additional one sentence docket entries denying each of James's substantive motions without a written opinion in light of the scheduled plea. (A 13).

On January 3, 2023, James pleaded guilty to all counts of the superseding indictment without a plea agreement. (DE 71). Before he pled guilty, James was advised that he was waiving his trial and appellate rights and defense counsel confirmed that there were no viable legal defenses to the charges in the superseding indictment. (A 121, 130).[5]

---

[5]     The district court advised James, "you will be giving up your right to a trial and all the other rights I have just discussed with you. There will be no trial in your case. There will be no appeal on the question of whether you did or did not commit the offenses charged in the superseding indictment." (A 121).

In his plea allocution, James admitted to shooting his firearm on the subway but falsely claimed that his "intention was to cause serious bodily injury to the people on the train" and that it was "not [his] intention to cause death," although he "was fully aware of the fact that a death or deaths could occur as a result of [his] discharging a firearm in such an enclosed space in the subway car." (A 133). The government responded that "if the case were to proceed to trial the government would prove beyond a reasonable doubt that the defendant fired his gun with the intent to kill the individuals on the subway car," but stated that James's allocution, while inaccurate, satisfied the baseline intent element of the statute. (A 134-35).

## IV. The Presentence Investigation Report

On June 29, 2023, Probation issued James's PSR and calculated that James's sentencing range for Counts One through Ten was life imprisonment on each count, which may run either concurrently or consecutively, plus a mandatory consecutive term of 120 months' imprisonment for Count Eleven. (PSR ¶ 187).

In coming to that calculation, Probation applied base offense level U.S.S.G. § 2A2.1 for "Assault with Intent to Commit Murder;

Attempted Murder."  (PSR ¶¶ 67-126).  Probation also determined that because James made material and willful false statements under the penalty of perjury at his plea allocution—in which he denied intending to kill his victims—a two-level enhancement for obstructing or impeding the administration of justice pursuant to U.S.S.G. § 3C1.1 was appropriate. (PSR ¶ 63).  Probation further determined that because James failed to fully accept responsibility for his offense conduct when he falsely claimed he only intended to cause serious bodily injury, the reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1 did not apply.  (PSR ¶ 64).

James subsequently failed to file timely objections to the PSR, which, according to Rule 32(f) of the Federal Rules of Criminal Procedure, was due within 14 days of receiving the PSR, or to ask for an extension. Instead, James filed his objections to the PSR for the first time on September 18, 2023, along with his sentencing submission.  (A 140-54). In his submission, James claimed that because he did not intend to commit murder, the "aggravated assault" provision of U.S.S.G § 2A2.2 should apply instead of the "attempted murder" provision of U.S.S.G. § 2A2.1.   (A 141-43).   James also argued that the obstruction

enhancement should not apply, and that he should receive the acceptance of responsibility reduction. (A 143-46). Notably, James did not request a hearing pursuant to United States v. Fatico, 604 F.2d 1053 (2d Cir. 1979), to challenge any facts set forth in the PSR.

On September 28, 2023, Probation filed an Addendum to the PSR responding to James's objections and declining to change its Guidelines calculation. (PSR Addendum).

V.    Sentencing

On October 5, 2023, the district court conducted a sentencing hearing and sentenced James to ten concurrent counts of life imprisonment on Counts One through Ten followed by a consecutive term of 10 years' imprisonment on Count Eleven. (A 460-64).

During the sentencing hearing, the district court "expressly adopt[ed] the factual findings" in the PSR. (A 420). The district court denied James's objections to the PSR (A 326-31, 333); heard argument from counsel as to the appropriate sentence (A 334-45; 357-60); heard a statement from James (A 346-56); heard five victim impact statements (A 362-79); and carefully analyzed each of the sentencing factors under 18 U.S.C. § 3553(a) (A 380-419).

A.    The Guidelines Calculation

The district court began by determining that the Guidelines calculation in the PSR was correct.  (A 326).  First, the district court stated that it agreed with Probation and the government that U.S.S.G. § 2A2.1(a) was the correct Guideline for Counts One through Ten of the superseding indictment.  (Id.).

The district court then made "specific findings" that James committed perjury when he claimed at his plea allocution that he did not intend to kill anyone, and, therefore, applied the two-level obstruction enhancement pursuant to U.S.S.G. § 3C1.1 for Counts One through Ten. (A 326-28).  The district court cited the "plethora of evidence" set forth by the government and outlined in the PSR which showed that James, in fact, did intend to commit murder, "including this defendant's choice of weaponry, the time, the place and the manner in which he executed the attack, and the defendant's own historical statements demonstrating his desire to kill."  (A 326-27).  The district court further found that James intentionally made the false statement at his plea hearing "for the purpose of receiving a lesser sentence and that [James's] false statement was material because it pertained to an element of the offense."  (A 328).

Lastly, based on James's perjury during his plea allocution, the district court agreed with Probation and the government that James was not entitled to the three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. (A 333).

While defense counsel noted James's objection to the district court's Guidelines calculation, defense counsel, again, did not request a Fatico hearing regarding any of the district court's factual findings.

B.    Section 3553(a) Factors

The district court then carefully reviewed each of the 18 U.S.C. § 3553(a) sentencing factors that underscored the basis for the sentence. (A 380).

The district court began by describing the nature and circumstances of the offense. (A 381). The district court described how James "methodically planned" the attack and the impact on the "grievously injured" victims. (A 383-84). The district court highlighted the "years" that went into James's planning, including the fact that he aimed at "seat height or higher," used a semi-automatic firearm with an extended magazine which enabled him to "fire bullets in rapid succession without having to pause to reload," and had two fully loaded extended

magazines with him. (A 382-83, 385-87). The district court further quoted several of James's social media posts which the district court found showed the "deliberate nature" of the attack and James's "yearning to commit murder." (A 386-87).

The district court also noted the Sentencing Commission's policy statement that "dozens of additional victims suffered injuries and emotional trauma which are not accounted for in the guidelines calculation and may warrant an upward departure under U.S.S.G. Section 5K2.0 and 5K2.21." (A 418). In addition, the district court described James's background and mental health issues (A 387-93); the purposes of sentencing (A 393); the sentencing options (A 395); and the need to avoid unwarranted sentence disparities (A 419).

Then, after addressing each of the Section 3553(a) factors individually, the district court imposed the sentence. Among other explanations for the sentence, the district court explained that James "attacked more than the heart and soul of the MTA. He attacked more than the heart and soul of the New Yorkers he shot. He coldly and calculatedly and deliberately attacked and attempted to terrify the very heart and soul of our nation." (A 426-27).

25

Following the sentencing, the district court granted the government's motion to dismiss the original indictment, thus dismissing the two counts that were the subject of James's motion to dismiss. (DE 92, 93).

## SUMMARY OF ARGUMENT

This Court should reject James's attempts to vacate his conviction or remand the case for resentencing.

<u>First</u>, the district court did not err, let alone clearly err, in finding that James obstructed justice when he lied under oath during his plea allocution and claimed that he did not intend to kill his victims. The evidence set forth in the PSR—which was adopted by the district court and never challenged by James—established that James lied when he said he only intended to cause serious bodily injury. The district court, therefore, correctly applied the U.S.S.G. § 3C1.1 sentencing enhancement for obstruction.

<u>Second</u>, the district court correctly withheld the reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because James committed perjury during his plea allocution.

<u>Third</u>, the district court correctly applied base offense level § 2A2.1, for assault with intent to commit murder, because the uncontested evidence proved James intended to commit murder when he fired 32 bullets on the crowded subway car.

27

Fourth, because James entered an unconditional guilty plea, he waived his right to appeal all non-jurisdictional defects with the indictment, and, thus, waived his right to challenge the issues raised in his motion to dismiss the indictment. Accordingly, this Court does not need to reach the merits of James's argument. Nevertheless, based on a plain reading of 18 U.S.C. § 1992(a)(7), the statute applies to James's mass shooting, and it is considered a crime of violence because the crime can only be committed through the use or threatened use of physical force. In addition, based on a plain reading of the statute, the aggravated offense of 18 U.S.C. § 1992(b)(1), which increases James's maximum sentence, clearly applies to James's conduct.

ARGUMENT

POINT ONE

THE DISTRICT COURT CORRECTLY APPLIED
THE OBSTRUCTION OF JUSTICE ENHANCEMENT

I.  The Law

A.  Standard of Review

The imposition of an obstruction-of-justice enhancement is subject to a mixed standard of review.  United States v. Brown, 321 F.3d 347, 351 (2d Cir. 2003).  The Court must "accept the findings of fact of the district court unless they are clearly erroneous."  United States v. Woodard, 239 F.3d 159, 161 (2d Cir. 2001).  However, a ruling that those facts "constitute obstruction or attempted obstruction under the Guidelines . . . is a matter of legal interpretation and is to be reviewed de novo."  United States v. Cassiliano, 137 F.3d 742, 745 (2d Cir. 1998).

B.  Enhancement for Obstruction
of Justice Under U.S.S.G. § 3C1.1

The Sentencing Guidelines provide for a two-level enhancement of a defendant's offense level if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the

defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The application note states that the obstruction enhancement applies to a situation, like this, where the defendant provides "materially false information to a judge." U.S.S.G. § 3C1.1, App. Note 4(f).

"[T]o base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Pena, 751 F.3d 101, 105 (2d Cir. 2014). "In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." United States v. Young, 630 F. App'x 52, 55 (2d Cir. 2015).

"The obstruction of justice enhancement under Section 3C1.1 is mandatory once its factual predicates have been established." United States v. Marigin, 66 F. App'x 266, 268-69 (2d Cir. 2003).

30

II.     Discussion

The district court properly applied the mandatory obstruction of justice enhancement to James's Guidelines calculation for Counts One through Ten.  Citing to the "plethora of evidence," none of which James contested, including James's "choice of weaponry, the time, the place and the manner in which he executed the attack, and the defendant's own historical statements demonstrating his desire to kill," the district court correctly held that James's statement during his plea hearing—that he only intended to cause serious bodily injury, not death—was false. (A 326-27).

The district court then properly found that James made the false statement "intentionally for the purpose of receiving a lesser sentence," that the false statement was "material because it pertained to an element of the offense," and that James acted "willfully" when he perjured himself.  (A 328).  Thus, the district court correctly described each element necessary to apply the enhancement.  Since the district court's findings were more than "plausible in light of the record viewed in its entirety," the determination is not "clearly erroneous" and should be upheld.  See United States v. Delossantos, 498 F. App'x 92, 93 (2d Cir.

2012) ("Under the clear error standard, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced . . . it would have weighed the evidence differently.").

James's arguments to the contrary are unavailing. Without providing any support, James makes the cursory claim that he did not intend to kill anyone when he fired 32 bullets on the crowded subway car. (See Br. 36). James, however, never asked for a Fatico hearing and never challenged any of the evidence set forth in the PSR and adopted by the district court proving he intended to kill his victims. (PSR ¶¶ 17-20, 34-46, 63). Because the district court's findings were supported by the record, James's challenge on appeal fails.

James's claim that he did not commit perjury because his statement was "irrational or mistaken," as opposed to intentionally false, also fails. (Br. 36). James's false statement is readily distinguishable from the type of statements that the Sentencing Commission warns against punishing because they do not "necessarily reflect a willful attempt to obstruct justice" since they result from "confusion, mistake, or faulty memory." (Id. at 35). James's false statement, to the contrary,

was not a product of "faulty memory." Rather, as the district court appreciated, his perjury was a carefully crafted statement intended to meet the bare-minimum elements of the statute necessary to plead guilty, while preserving an argument for a lower Guidelines calculation at sentencing.

Indeed, courts have applied the obstruction enhancement in cases like this where a defendant made a false statement in his plea allocution in hopes of obtaining a lower sentence. In United States v. Sweeny, for example, a defendant claimed during his plea allocution that he only drove the getaway car during a bank robbery. 797 F. Supp. 2d 233, 235 (E.D.N.Y. 2011), aff'd, 485 F. App'x 468 (2d Cir. 2012). After a Fatico hearing, the district court found that the defendant entered the bank and demanded money from a teller, and therefore, his "false statements were material within the meaning of § 3C1.1 because, if believed, they would influence his sentence." Id.

James, like the defendant in Sweeny, lied about a material fact to influence his sentence. The district court's findings were entirely supported by the record. Accordingly, this Court should uphold the

application of the obstruction of justice enhancement to the Guidelines

calculation for Counts One through Ten.

## POINT TWO

### THE DISTRICT COURT CORRECTLY DENIED JAMES AN ACCEPTANCE OF RESPONSBILITY REDUCTION BASED ON JAMES'S FALSE STATEMENTS

I.    The Law

    A.    Standard of Review

A district court's decision to deny the acceptance of responsibility reduction is reviewed for abuse of discretion. United States v. Strange, 65 F.4th 86, 89 (2d Cir. 2023). "Because the sentencing court is in a unique position to evaluate a defendant's acceptance of responsibility, its determination is entitled to great deference on review, and it will not be disturbed unless it is without foundation." Id. Thus, this Court "must accept the district court's fact findings unless they are clearly erroneous." United States v. Remini, 967 F.2d 754, 761 (2d Cir. 1992).

    B.    Reduction for Acceptance of Responsibility Under U.S.S.G. § 3E1.1

The Sentencing Guidelines provide for up to a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. As this Court has made clear, "[a] guilty plea does not, by itself, entitle a defendant to a reduced sentence under § 3E1.1. The defendant must

truthfully admit the conduct comprising the offense of conviction." United States v. Reyes, 9 F.3d 275, 279 (2d Cir. 1993). "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, App. Note 1(a).

While "a sentencing court may not compel testimony in respect of any offense <u>other</u> than the offense that is the subject of the plea . . . as to the offense that <u>is</u> the subject of the plea, the district court may require a candid and full unraveling, and need not accept lies or equivocation." <u>Reyes</u>, 9 F.3d at 279. Where a defendant is not candid, "[t]he district court may deny a reduction under § 3E1.1 of the Guidelines based on a credibility determination that the defendant has not accepted responsibility for the offense of conviction." <u>Id.</u> at 280.

A defendant who engages in "conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily" is not entitled to the reduction, as such conduct "indicates that the defendant has not accepted responsibility for his criminal conduct." <u>United States v. Kumar</u>, 617 F.3d 612, 635 (2d Cir. 2010).

II.   Discussion

The district court did not abuse its discretion in denying an acceptance of responsibility reduction under U.S.S.G. § 3E1.1.

As described above, in finding that James intended to kill his victims, the district court carefully evaluated the uncontested facts regarding the way James carried out the attack, the weapons he used, the timing and location of the attack, and James's own social media posts in which he indicated that he wanted his bullets to kill people. (A 326-27; PSR ¶ 43 ("[S]ticks and stones may break my bones and your words my [sic] even hurt me but you better know this you son of a b***h these 9mm bullets will kill you.")).  The district court then properly determined that James did not accept responsibility for his crimes when he falsely claimed that he only intended to seriously injure his victims. (A 328 ("[Y]our claim during your plea allocution that you did not intend to kill the victims of your crime was a false claim.")).

Because the sentencing court was in the best position to evaluate James's candor at his plea hearing and evaluate the evidence regarding James's intent to kill his victims, it was well within the district court's discretion to withhold the acceptance of responsibility reduction.

James's claim that his intent is "unknowable" because of his mental health issues is paradoxical and unpersuasive. (Br. 38). James cannot argue that it is impossible to decipher his intent because of his mental health issues—a defense he did not raise before the district court—while at the same time claiming the evidence showed his intent was to cause serious bodily injury.

In any event, James is wrong that the evidence merely showed an "indifference to human life." (Id.). James's argument that he could not have intended to commit murder since his bullets—miraculously—did not hit anyone in the head or chest and no one died (see Br. 38-39), is negated by the evidence. First, James's own purported expert determined that the defendant has low "visual-motor/visual-spatial reasoning" which, if credited, could explain why he failed to succeed in his effort to kill victims. (A 199). Second, while James focuses on the fact that no one died from his gunfire, he ignores the fact that several victims required life-saving surgery and could have died had they not received emergency medical care. (PSR ¶¶ 47, 51, 53-54, 56).

James also is incorrect that the trajectory of his bullets demonstrated his lack of intent to kill. (Br. 39). The uncontested record

shows the opposite. Most of the bullets James fired—20 out of 32 bullets—were fired at seat height or higher, which would be expected to hit victims who were seated or standing. (PSR ¶ 20; DE 84, Ex. 2 at 16). As the district court found, the fact that none of the bullets hit victims in the chest was luck, not James's intentional choice. (A 383).

Moreover, James's argument that he should receive the acceptance of responsibility reduction regardless of his perjury because he "unequivocally admitted his conduct" (Br. 39) is contrary to the record and the law. First, there was nothing "unequivocal" about James's statement at his plea: James lied about his intent—a key element of the offenses. Second, the law is clear that where a defendant "accepted responsibility for conduct that satisfies the bare essentials of the offense of conviction, [but] his explanation of his conduct was, in the eyes of the district judge, 'unbelievable,'" it is appropriate to withhold the § 3E1.1 reduction. Reyes, 9 F.3d at 280.

In Reyes, for example, the defendant pled guilty to conspiracy to import cocaine. In his plea allocution, the defendant admitted to diving under a boat to look for cocaine but claimed "that the sole objective of the diving expedition was to 'look underneath the boat to see if there

was a container there'" and not to remove the cocaine.  <u>Id.</u> at 278.  The district court, however, found that the defendant intended to remove the cocaine from the ship and withheld the acceptance of responsibility reduction.  <u>Id.</u>  This Court affirmed the ruling, stating that the defendant's lack of "candor in explaining the conduct comprising his offense of conviction" did not warrant an acceptance of responsibility reduction.  <u>Id.</u> at 281.[6]

Similarly, here, the district court evaluated the evidence of James's intent to kill, determined James's plea lacked candor, and properly withheld the acceptance of responsibility reduction. Accordingly, the Court should affirm the district court's decision to withhold the acceptance of responsibility reduction.

---

[6]     <u>See also</u> <u>Kumar</u>, 617 F.3d at 636 (affirming the district court's determination to withhold the § 3E1.1 reduction where the defendant's "carefully worded plea allocution . . . muted the gravity of his complicity in the securities fraud offenses."); <u>United States v. Ward</u>, 148 F. App'x 17, 18 (2d Cir. 2005) (affirming the district court's determination to withhold the § 3E1.1 reduction where the defendant "expressed, at the very least, equivocation that hedged his culpability.").

<u>POINT THREE</u>

THE DISTRICT COURT APPLIED THE CORRECT GUIDELINES
<u>PROVISION FOR ASSAULT WITH INTENT TO COMMIT MURDER</u>

I.    <u>The Law</u>

A.    <u>Standard of Review</u>

"[I]n determining the appropriate standard of review for a district court's application of the Guidelines to the specific facts of a case, [the court] should follow an either/or approach, adopting a <u>de</u> <u>novo</u> standard of review when the district court's application determination was primarily legal in nature, and adopting a clear error approach when the determination was primarily factual."   <u>United States v. Gotti</u>, 459 F.3d 296, 349 (2d Cir. 2006).   Where, as here, the question concerns the district court's application of the Sentencing Guidelines to the facts of the case, a "predominantly factual rather than legal" issue is present, and the clear error standard applies.   <u>Id.</u>

B.    Base Offense Level §§ 2A1.1(a)(1) (Assault
      with Intent to Commit Murder; Attempted
      <u>Murder) and 2A2.2 (Aggravated Assault)</u>

U.S.S.G. § 2A2.1 is the base offense level for "Assault with Intent to Commit Murder; Attempted Murder."   U.S.S.G. § 2A2.1, Application Note 1 defines First Degree Murder as conduct that would

constitute murder under 18 U.S.C. § 1111, which includes the "unlawful killing of a human being with malice aforethought." <u>See</u> 18 U.S.C. § 1111; U.S.S.G. § 2A2.1, cmt. n.1. First-degree murder requires a "willful, deliberate, malicious, and premeditated killing." <u>United States v. Passley</u>, Nos. 22-1361, 22-1368, 2023 WL 8921150, at *1 (2d Cir. Dec. 27, 2023) (summary order) (quoting 18 U.S.C. § 1111). "Attempted murder . . . requires both a specific intent to kill . . . and conduct amounting to a substantial step towards the commission of the crime." <u>Id.</u>

U.S.S.G. § 2A2.2 is the base offense level for "Aggravated Assault." U.S.S.G. § 2A2.2 Application Note 1 defines Aggravated Assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (<u>i.e.</u>, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, App. Note 1.

II. <u>Discussion</u>

The district court correctly applied the base offense level U.S.S.G. § 2A2.1 for "Assault with Intent to Commit Murder; Attempted Murder." As described in detail above, the undisputed evidence

overwhelmingly supported the district court's finding that James fired his gun 32 times with the specific intent to kill his victims.

Notably, the district court made factual findings refuting James's claim that the evidence showed he only acted with "[e]xtreme indifference to human life." (Br. 43). For example, the district court found that it was "not due to [James's] skilled marksmanship" that no victims died, but rather due to incredible fortune, while noting that James aimed his bullets "targeting where passengers would be expected to sit or stand" and many victims were "grievously injured." (A 382-83). Indeed, the evidence showed that James had an over 50 percent "hit rate" which was "high" as compared to "most shooting incidents and is a direct result and decision by the shooter to carry out the attack from a position of advantage with passengers trapped within the confines of a narrow subway car." (DE 84, Ex. 2 at 16). The district court also highlighted James's own social media posts which "demonstrate[ed] his desire to kill." (A 326-27). For example, James posted messages such as, "If you keep f***ing with me, one or both of us is not going to be on this earth anymore" and "you better know this you worthless b***h [dead on arrival] is ONLY thing I'm trying to label you." (PSR ¶¶ 37, 40).

Thus, the district court was well within its discretion to find that James intended to kill his victims and correctly applied base offense level § 2A2.1. Notably, this Court has upheld the application of base offense level § 2A2.1 where, as here, there was ample evidence a defendant intended to kill his victims despite the fact no victims died. See, e.g., United States v. Green, No. 22-800-CR, 2023 WL 7180645, at *2 (2d Cir. Nov. 1, 2023) (Upholding the application of § 2A2.1 where the district court observed the defendant's "claim that he fired only 'warning shots' made 'no sense at all,'" because he did not shoot "up in the air."); Passley, 2023 WL 8921150, at *2 (upholding the application of § 2A2.1 where a defendant "pulled up next to the Victims' van, took out a handgun, and fired into the side of the van."); United States v. Rodriguez, 738 F. App'x 729, 730 (2d Cir. 2018) (upholding the application of § 2A2.1 where a defendant "wait[ed] for a specific vehicle to approach from down the street, conceal[ed] his presence before firing four shots into the vehicle at close range, and then . . . calmly [left] the scene of the shooting."). Accordingly, the Court should affirm the district court's Guidelines calculation.

<u>POINT FOUR</u>

JAMES WAIVED THE RIGHT TO
CHALLENGE THE SUPERSEDING
<u>INDICTMENT AND HIS ARGUMENTS ARE MERITLESS</u>

I.    <u>The Law</u>

A.    <u>Standard of Review</u>

Typically, a district court's denial of a motion to dismiss is reviewed <u>de novo</u>. <u>United States v. Vilar</u>, 729 F.3d 62, 79 (2d Cir. 2013). Unpreserved constitutional claims, however, are reviewed for plain error. <u>United States v. Abad</u>, 514 F.3d 271, 274 (2d Cir. 2008). Here, James pled guilty before the district court ruled on the merits of his motion to dismiss the original indictment. Accordingly, his abandonment of the motion should be treated as a failure to object to the indictment and the plain error standard applies. <u>See, e.g.</u>, <u>United States v. White</u>, 543 F. App'x 563, 571 (6th Cir. 2013) ("[W]hen a party does not renew an objection to an undecided motion in limine during trial, the issue is reviewed for plain error."). Under either standard of review, however, James's arguments are waived and lack merit.

B.    18 U.S.C. § 1992

All three of James's challenges to the indictment depend on the interpretation of 18 U.S.C. § 1992.    "[T]he starting point for interpreting a statute is the language of the statute itself.    Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."    Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

Section 1992 criminalizes "[t]errorist attacks and other violence against . . . mass transportation systems."  18 U.S.C. § 1992.  The conduct prohibited by the statute is enumerated in several paragraphs of subsection (a), which range from narrow prohibitions that protect against specific threats of violent harm, to broader prohibitions that ensure protection for all parts of a railroad carrier or mass transportation system against a more expansive range of violent harms.    For example, the statute starts at §§ 1992(a)(1) and (a)(2) by protecting against specific means of causing harm, with (a)(1) punishing any person who "knowingly . . . wrecks, derails, sets fire to, or disables railroad on-track equipment or a mass transportation vehicle," and (a)(2) punishing any person who "places any biological agent or toxin, destructive substance, or

destructive device in, upon, or near railroad on-track equipment or a mass transportation vehicle with intent to endanger the safety of any person, or with a reckless disregard for the safety of human life." Id.

Section 1992(a)'s prohibitions on violent conduct culminates with § 1992(a)(7), which prohibits the "commi[ssion of] an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person who is on property described in subparagraph (A) or (B) of paragraph (4)." Id. Thus, the statute expressly states that it covers any person "on" the enumerated property. The list of "propert[ies]" described at § 1992(a)(4)(B) is expansive, and, like the structure of § 1992(a), starts with the specific, "garage, terminal, structure, track, electromagnetic guideway, supply" before ultimately embracing the more general "facility used in the operation of, or in support of the operation of, a mass transportation vehicle." Id. § 1992(a)(4)(B).

Notably, while § 1992(a)(7) offers protection against a far broader range of violent conduct than §§ 1992(a)(1)-(a)(6), it is also more specific, in that it demands evidence that the defendant intended his act to cause death or serious bodily injury. Sections 1992(a)(1)-(a)(6), by

contrast, prohibit a narrower range of violent conduct, but contain less burdensome mental state requirements that can be satisfied by proof that the defendant acted knowingly, see id. §§ 1992(a)(1), (a)(4), (a)(5), or with reckless disregard, see id. §§ 1992(a)(2), (a)(3), (a)(6), or that the defendant intended "to endanger the safety of any person," see id. §§ 1992(a)(2), (a)(3), (a)(6).

Taken together, these provisions demonstrate Congress's particular concern with certain threatened harms (such as train wrecking, and the use of explosives, biological and chemical weapons), and its desire to ensure broader protection against any acts intended to kill or seriously injure those using or working on rail and mass transportation systems. Section 1992(a)(7) thus protects any person on the property of a mass transportation system ("any person who is on" a "facility used in the operation of, or in support of the operation of, . . . a mass transportation vehicle"), from acts of violence ("acts" intended "to cause death or serious bodily injury"). Id. §§ 1992(a)(4)(B), (a)(7).

In keeping with Congress's apparent purpose to protect those using and working on rail and mass transportation systems, the maximum penalty for a violation of § 1992(a) is increased from 20 years

48

to life in prison if the defendant commits the offense when "the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense." 18 U.S.C. § 1992(b)(1).

C.  "Crime of Violence" Under Section 924(c)

Section 924(c)(1)(A) provides that "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence," be punished as specified in the statute. Section 924(c)(1)(A)(iii) imposes a mandatory consecutive term of 10 years to life imprisonment if the firearm that the defendant used or possessed was discharged. The statute defines "crime of violence" as a felony:

> (A)  [that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Id. § 924(c)(3)(A)-(B).

In <u>United States v. Davis</u>, 139 S. Ct. 2319, 2336 (2019), the Supreme Court struck down the "residual clause" of Section 924(c)(3)(B) as unconstitutionally vague. Accordingly, following <u>Davis</u>, in order for an offense to serve as a predicate crime of violence for a Section 924(c) charge, it must qualify as a crime of violence under the "elements clause" or "force clause" of Section 924(c)(3)(A).

Whether an offense qualifies as a crime of violence under the elements clause is a question of law, determined by applying the "categorical approach." <u>Davis</u>, 139 S. Ct. at 2328; <u>United States v. Hill</u>, 890 F.3d 51, 55 (2d Cir. 2018). Under the categorical approach, "courts identify the minimum criminal conduct necessary for conviction under a particular statute," <u>Hill</u>, 890 F.3d at 55, by conducting an analysis of the elements of the offense grounded in "reality, logic, and precedent, not flights of fancy," <u>id.</u> at 56 (citing <u>Moncrieffe v. Holder</u>, 569 U.S. 184, 190-91 (2013)).

II.  <u>Discussion</u>

A.  James Waived His Right to Challenge the <u>Issues Raised in His Motion to Dismiss the Indictment</u>

This Court need not reach the merits of James's argument because James waived his right to challenge the issues raised in his

motion to dismiss the original indictment by entering an unconditional guilty plea before the district court ever ruled on the merits of his motion.[7]

"It is well settled that a defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings." United States v. Garcia, 339 F.3d 116, 117 (2d Cir. 2003) (citing United States v. Calderon, 243 F.3d 587, 590 (2d Cir. 2001)); accord Hayle v. United States, 815 F.2d 879, 881 (2d Cir. 1987).[8] To preserve the right to challenge non-jurisdictional defects after entry of a guilty plea, a defendant must have obtained "a court-approved reservation of issues for appeal." Hayle, 815 F.2d at 881. Under Rule

---

[7]    In fact, the very relief James requests—reversal of the district court's denial of his motion to dismiss the original indictment (Br. 44)—is moot because the district court already dismissed every count in the original indictment after James pled guilty to the superseding indictment.

[8]    As this Court noted in United States v. Rubin, 743 F.3d 31, 35 n.3 (2d Cir. 2014), the Supreme Court has recognized narrow exceptions to this rule for two constitutional claims: due process claims for vindictive prosecution and double jeopardy claims that are evident from the face of the indictment.  James does not, and could not, contend that either exception applies here.

11(a)(2) of the Federal Rules of Criminal Procedure, this reservation must be made in writing and with the consent of the government.

Notably, a defendant's claim that an indictment or information charges a "non-offense" is not a claim of "jurisdictional" deficiency sufficient to survive the waiver rule set forth above. <u>Rubin</u>, 743 F.3d at 37 ("[C]hallenges to indictments on the basis that the alleged conduct does not constitute an offense under the charged statute are also non-jurisdictional challenges."); <u>see also</u> <u>United States v. Cotton</u>, 535 U.S. 625, 630-31 (2002) ("[A] district court 'has jurisdiction of all crimes cognizable under the authority of the United States . . . [and] [t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case.'" (quoting <u>Lamar v. United States</u>, 240 U.S. 60, 65 (1916))).

The Supreme Court's decision in <u>Lamar</u> is instructive. In <u>Lamar</u>, a jury convicted the defendant, who had impersonated a member of Congress, of falsely pretending to be a U.S. officer. 240 U.S. at 64. On appeal, the defendant argued that the district court lacked jurisdiction because a congressman was not "an officer of the United States" as alleged in the indictment—<u>i.e.</u>, the indictment charged a non-offense. <u>Id.</u>;

Rubin, 743 F.3d at 37. The Supreme Court rejected this argument, noting that "[j]urisdiction is a matter of power and covers wrong as well as right decisions" and that "[t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case." Lamar, 240 U.S. at 64-65. Thus, the argument that an indictment charges a "non-offense" does not implicate a district court's subject-matter jurisdiction and therefore can be waived by an unconditional guilty plea. See Cotton, 535 U.S. at 630-31.

In order to invoke a district court's jurisdiction, an indictment "need only allege that a defendant committed a federal criminal offense at a stated time and place in terms plainly tracking the language of the relevant statute." Rubin, 743 F.3d at 38; see also United States v. Frias, 521 F.3d 229, 235-36 (2d Cir. 2008) (holding that an indictment that "plainly tracks the language of the statute and states the time and place of the alleged [crime]" is "sufficient to invoke the district court's jurisdiction"). "When such jurisdiction is established, a district court has authority to decide all other issues presented within the framework of the case, including whether to accept a guilty plea." Rubin, 743 F.3d at 39.

Here, the face of both the original indictment and superseding indictment plainly alleged the elements of the charged offenses. Thus, there is no jurisdictional defect in the charging documents. Because James entered an unconditional guilty plea, James waived his right to appeal all non-jurisdictional defects, including any argument that the original indictment and superseding indictment alleged "non-offenses." Accordingly, this Court need not reach the merits of James's arguments and his claim should be denied.

### B. Section 1992(a)(7) Criminalizes James's Conduct

Based on a plain, common sense reading of the statute, Section 1992(a)(7) criminalizes James's conduct. James's arguments to the contrary distort the statute.

James's first argument—that because he was charged with shooting passengers in a subway car, which is a "mass transportation vehicle," his conduct did not violate § 1992(a)(7)—defies common sense. (Br. 44). Specifically, James argues that because other provisions of § 1992(a) include prohibitions against attacks on "mass transportation vehicles" and a "mass transportation vehicle" is not among the "propert[ies]" specifically listed at §§ 1992(a)(4)(A) and (B), a "plain

54

textual" reading of § 1992(a)(7) requires the Court to conclude that Congress did not intend to prohibit acts intended to kill or cause serious bodily injury to a person who is on a subway car. (Br. 44-47). James's illogical interpretation of the statute—which would require this Court to hold that § 1992(a)(7) criminalizes shooting a victim standing on a subway platform but has nothing to say once the victim steps from the platform onto a waiting subway car—is inconsistent with the plain language of the statute.

James was charged with violating § 1992(a)(7) by shooting passengers carried by a subway car while the car, and its passengers, were <u>on</u> property described at § 1992(a)(4)(B), namely, a subway track and in a structure and facility used in the operation of the subway system. Common usage and common sense dictate that passengers who are carried in a vehicle are "on" the property on which the vehicle stands. After all, a person who knowingly drives a car onto private property without permission cannot object that he was not trespassing because he remained in the vehicle. Thus, the superseding indictment sufficiently alleged that the passengers James shot on the subway car were persons "on property" described at § 1992(a)(4)(B).

James is wrong to argue that the fact that a "mass transportation vehicle" is not one of the "propert[ies]" cross-referenced by the statute evidences a congressional intent to exclude passengers carried in subway cars on such a property, like a "track," from the protections of § 1992(a)(7). (Br. 47). Section 1992(a)(7)'s protections apply without limitation to "any person who is on property" described at §§ 1992(a)(4)(A) and (B), and nothing in the text or structure of the statute suggests that Congress intended to exclude from its protections those persons who are carried in a vehicle that is on such property.

James correctly notes that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it's generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (Br. 46). However, he infers the wrong intention from the fact that Congress did not include "mass transportation vehicle" in the examples of properties cross referenced by § 1992(a)(7). The reason for the term's exclusion was not, as James argues, because Congress specifically intended to exclude persons carried in mass transportation vehicles from the protections of the statute, but because it was unnecessary.

The "property" described by 18 U.S.C. §§ 1992(a)(4)(A) and (B), is real property, including garages, buildings, and related infrastructure, all of which is "used in the operation of, or in support of the operation of, a railroad carrier" under (a)(4)(A), or "used in the operation of, or in support of the operation of, a mass transportation vehicle," under (a)(4)(B).  Congress thus anticipated that railroad on-track equipment and mass transportation vehicles would carry people when they operated on properties "used in the operation of, or in support of the operation of," a railroad carrier or mass transportation vehicle.  Because in ordinary usage a person who is in a vehicle is also "on" the property on which the vehicle stands, it was not necessary for Congress specifically to add "mass transportation vehicle" to the list in order to extend § 1992(a)(7)'s protections to the people carried in the mass transportation vehicle.

Thus, it does not follow that Congress intended to <u>exclude</u> from § 1992(a)(7)'s protection those persons carried in a mass transportation vehicle on the property of a mass transportation system simply because Congress did not list a "mass transportation vehicle" as a "property" in a list of dissimilar items alongside, for example, a

"terminal" or a "track." Indeed, adding "mass transportation vehicle" to a list of examples of real property would have risked greater confusion and ambiguity as to what Congress meant when it referenced the property described at § 1992(a)(4)(B). See Leocal v. Ashcroft, 543 U.S. 1, 9 (2004) ("[W]e construe language in its context and in light of the terms surrounding it."); cf. Johnson v. United States, 576 U.S. 591, 603 (2015) ("The phrase shades of red, standing alone, does not generate confusion or unpredictability; but the phrase fire-engine red, light pink, maroon, navy blue, or colors that otherwise involve shades of red assuredly does so.").

Nor is it relevant to this analysis that, in other provisions of § 1992, Congress chose specifically to protect mass transportation vehicles against harm that uniquely threatens the operation of such vehicles, such as attacks on drivers during the operation of vehicles in § 1992(a)(6), but chose not to do so in § 1992(a)(7). As discussed above, the structure of § 1992(a) reflects that Congress intended § 1992(a)(7) to address a broader range of violent conduct threatening mass transportation systems than the more specific harms addressed by other paragraphs of § 1992(a).

58

Indeed, only the government's interpretation of § 1992(a)(7) gives operative effect to all the statute's terms. Section 1992(a)(7)'s protections extend to "any person who is on property described in subparagraph (A) or (B) of paragraph (4)," but the list of specifically enumerated properties includes places such as a "track," which carries conventional train cars, and an "electromagnetic guideway," which carries maglev trains, where a "person" would not typically be found unless they were carried on them by a train. Had Congress intended to restrict § 1992(a)(7)'s protections only to those persons standing directly on the referenced properties, it would have made little sense to include "track" and "electromagnetic guideways" in the list since the statute would only prohibit an act of violence against a victim who, for example, had already fallen onto a subway track or climbed onto an electromagnetic guideway.

Under James's interpretation of § 1992(a)(7), conversely, it would be a federal crime to shoot a person as they stand on the subway platform (a "terminal" "structure" and "facility used in the operation of, or in support of the operation of, a mass transportation vehicle"), but such person would cease to be "on" property when they step into a subway car

(a "mass transportation vehicle"), which itself stands at the platform on an electrified "track" and "facility used in the operation of, or in support of the operation of, a mass transportation vehicle."  James offers no reason why Congress could have intended this absurd result, and, because nothing in the plain language of the statute dictates it, this Court should interpret the statute to avoid it.  See Gibbons v. Bristol-Myers Squibb Co., 919 F.3d 699, 705 (2d Cir. 2019) ("[A] statute should be interpreted in a way that avoids absurd results").

James's argument also defies the congressional intent evident from the structure of the statute.  "[S]tatutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Nken v. Holder, 556 U.S. 418, 426 (2009).  As detailed above, § 1992 manifests a congressional purpose to provide comprehensive protection against a wide range of threats to those using and working on mass transportation and rail systems.  The statutory structure accordingly reflects several narrower prohibitions on specific harms of special concern for which Congress carefully required proof of varying mental states, and broader protection for any person on the property of a mass transportation system from any

60

"act" committed "with the intent to cause death or serious bodily injury."
18 U.S.C. 1992(a)(7). The government's interpretation of the statute is
consistent with this purpose and ensures the protection of persons on the
property of the New York City subway system, both on the subway
platform and on the subway train.

Because a person carried by a subway car that is on the
subway track and in subway tunnels is "on" property described at
§ 1992(a)(4)(B), Counts One through Ten of the superseding indictment
alleged violations of 18 U.S.C. § 1992(a)(7). Accordingly, James's appeal
should be denied.

C.   The Sentencing Enhancement in
     Section 1992(b)(1) Applies to Section 1992(a)(7)

James's argument that the aggravating provision of
§ 1992(b)(1) does not apply to § 1992(a)(7) is meritless.[9]   Section
1992(b)(1) imposes an enhanced penalty when a person commits any
offense delineated in § 1992(a), and the offense was committed in a
circumstance involving a mass transportation vehicle carrying at least

---

[9]   This issue is pending before the Court in United States v.
Ullah, No. 21-1058-CR, heard on April 27, 2022.

one passenger or employee. <u>See</u> 18 U.S.C. § 1992(b)(1). James's argument that the aggravating provision applies only to offenses in subsection (a) that specifically prohibit attacks on mass transportation vehicles, and thus cannot apply to subsection (a)(7), is contradicted by the statute's plain language.

According to the statute, the sentencing enhancement in subsection (b)(1) applies by its express terms to "[w]hoever commits an offense under subsection (a)" in a circumstance in which the mass transportation vehicle is carrying a passenger or employee at the time of the offense. 18 U.S.C. § 1992(b)(1). The plain language of the statute does not limit § 1992(b)(1)'s application to § 1992(a)(1), (a)(2), or (a)(4), but instead says section (a). Under James's unsupported reading of (b)(1), however, the aggravating provision would never apply to several of the offenses listed in subsection (a), because they do not expressly require that the attack involve railroad on-track equipment or a mass transportation vehicle. <u>See, e.g.</u>, 18 U.S.C. §§ 1992(a)(3), (a)(5), (a)(7), (a)(8), (a)(9). But had Congress intended for the sentencing enhancement to apply only to some of the offenses set forth in subsection (a), the statute would have said that. <u>See</u> <u>United States v. Albertini</u>, 472 U.S. 675, 680

(1985) (statutory interpretation "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"); <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

The plain language of subsection (b)(1) makes clear on its face that the aggravating provision applies to every offense listed in subsection (a), so long as the commission of the offense in a particular case involves a mass transportation vehicle carrying a passenger or employee. Here, the superseding indictment clearly alleged the subway car was carrying passengers when James fired his gun. Accordingly, James's challenge to the application of the aggravating provision should be rejected.

D. A Violation of Section 1992(a)(7) is a
   <u>Crime of Violence Under Section 924(c)</u>

James's challenge to his conviction under § 924(c) fails because § 1992(a)(7) requires the use of force intended to kill another person, and, therefore, is a crime of violence. <u>See</u> 18 U.S.C. § 1992(a)(7)

63

(violation requires that defendant "commit[] an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person."). Where, as here, a statute criminalizes an action intended to cause death or serious bodily injury, courts have held that the crime categorically requires the use of force in its commission, and thus constitutes a crime of violence. See United States v. Scott, 990 F.3d 94, 101, 107 (2d Cir. 2021) (en banc) (finding first-degree manslaughter under New York State law, which requires an "intent to cause serious physical injury" that causes the death of another, is a crime of violence and explaining that "[s]ix of our sister circuits agree that crimes intentionally causing physical injury are categorically violent even if committed by omission").

Contrary to judicial precedent, James claims that § 1992(a)(7) is not a crime of violence because it theoretically could apply to a defendant who attempts to kill himself in a subway station, without exerting any force against "the person or property of another" as required by § 924(c). (Br. 53). The plain language of § 1992(a)(7) and its context, however, makes clear that Congress did not intend to impose criminal

64

liability on a person who attempts to commit suicide without any intent to cause harm to another.

Section 1992(a)(7) is written to prohibit one person from committing an act intended "to cause death or serious bodily injury to any person" on the property of a mass transportation system. The most natural reading of this provision is that it prohibits one person from causing harm to a different person, not to himself. Indeed, the lack of any federal statute criminalizing suicide or attempted suicide makes it even less likely that Congress intended to do so implicitly in the language found at § 1992(a)(7). Although attempted suicide was an offense at common law, "[n]one of the modern codifications treats attempted suicide as a crime," Wayne R. LaFave, Substantive Criminal Law, § 15.6(a) (3d ed. 2018), and there is no reason to believe that Congress sought to criminalize it in § 1992. See Scott, 990 F.3d at 106 ("a defendant must at least point to his own case or other cases in which [New York] courts in fact did apply the statute in the matter for which he argues.").

The context in which Congress used the term "any person" in other provisions of § 1992 further confirms that Congress did not intend "any person" to refer to the person charged with violating § 1992(a)(7).

Sections 1992(a)(3) and (a)(6), for example, prohibit certain conduct undertaken "with intent to endanger the safety of any person," language that, as in § 1992(a)(7), can only be understood to refer to the safety of a person other than the defendant charged with the offense. See 18 U.S.C. §§ 1992(a)(2), (a)(3), (a)(6). This understanding is confirmed by the "recklessness" standard in both § 1992(a)(3) and (a)(6)—there can be no serious argument that, in these provisions, Congress took the unprecedented step of criminalizing behavior that created a "substantial and unjustifiable risk" of harm only to the perpetrator of the crime. In other words, it is inconsistent with basic principles of criminal law that Congress would have made it a crime for a person to take an act that was reckless only as to his own safety, but it is entirely consistent with those principles that, in §§ 1992(a)(3) and (a)(6), Congress prohibited acts undertaken with either the specific intent to harm others, or with reckless disregard to that possibility.

But any doubt about these contextual clues to Congress's intent is cleared away by the provisions of §§ 1992(a) and 1992(b) which fix penalties for the offenses and provide for enhanced punishment "if the offense results in the death of any person." 18 U.S.C. § 1992(b)(1)

(emphasis added). Since no one would be punished if a person's crime resulted in his own death, it is clear from the context that, as used in § 1992, "any person" means "any other person." Because "a legislative body generally uses a particular word with a consistent meaning in a given context" and "individual sections of a single statute should be construed together," Erlenbaugh v. United States, 409 U.S. 239, 243-44 (1972), the structure of the statute makes clear that "any person" as used in § 1992(a)(7) cannot refer to the perpetrator of the crime.

Moreover, James cites no case in which anyone has been prosecuted under § 1992 for self-harm, or for being reckless as to the risk of self-harm, because § 1992 simply cannot be understood to prohibit that conduct. James's assertion to the contrary is little more than "the application of legal imagination to the . . . statute's language." Hill, 890 F.3d at 56. As this Court has made clear, there must be "a realistic probability, not a theoretical possibility," that the statute could be applied to conduct that does not qualify under the elements clause, which means that "a defendant must at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the . . . manner for which he argues." Id. But in light of the structure of the statute, and the

use of the phrase "any person" in the provisions of § 1992 discussed above, the prosecution under § 1992(a)(7) of a person who commits an act on a subway with intent only to injure himself is hardly even "theoretical," much less "realistic," and nothing more than a "flight[] of fancy." See Hill, 890 F.3d at 56.

James's second argument—that § 1992(a)(7) does not require the use, attempted use, or threatened use of force because the "act" could be satisfied by something innocuous lacking force, such as walking into the terminal with an intent to hurt someone (Br. 55)—similarly fails. Contrary to James's argument, it is not relevant whether the substantial step itself involved the use of force since the completed offense requires the use of force and therefore an "attempt" to commit the offense necessarily involves the "attempted use of physical force." See Alvarado-Linares v. United States, 44 F.4th 1334, 1347 (11th Cir. 2022) ("[W]hen a crime has as an element a substantial step plus intent to use force against another person, that crime has as an element the attempted use . . . of physical force against the person of another.").

In the context of determining whether attempted Violent Crimes in Aid of Racketeering Act ("VICAR") murder is a crime of

violence, the Eleventh Circuit in <u>Alvarado-Linares</u> addressed hypothetical non-violent substantial steps similar to the examples that James raised in his brief. In finding that a substantial step does not need to be a violent act for the statute to be considered a crime of violence, the Eleventh Circuit explained that a "[a] criminal who contracts with a potential hitman—locating, hiring, meeting, paying him—is either using force (if the murder is carried out) or attempting to use force (if the plot fails)." <u>Id.</u> at 1348. The same is true in the context of § 1992(a)(7). A completed violation of § 1992(a)(7) requires the use of force (an "act" that causes death or serious bodily injury), and an unsuccessful violation necessarily requires the attempt to use force (a failed act intending to cause death or serious bodily injury). Thus, § 1992(a)(7) categorically qualifies as a crime as violence.

Insofar as James suggests that § 1992(a)(7) is not a crime of violence under the elements clause because it can be violated through an "act of omission"—such as walking away from a distraught passenger who is threatening to jump on the tracks (Br. 55)—the argument is foreclosed by this Court's <u>en banc</u> decision in <u>Scott</u>, 990 F.3d at 101, which held that an act of omission can involve the use of physical force

required by analogous elements clause provisions of the Armed Career Criminal Act and the career offender guideline. See Scott, 990 F.3d at 114 ("[a] defendant intent on causing serious physical injury can employ . . . violent force whether he initiates that force by his own physical act or breaches a legal duty to check or redress force already in motion.").

Accordingly, § 1992(a)(7) is a crime of violence and James's challenge to his § 924(c) conviction in Count Eleven of the superseding indictment fails.

70

## CONCLUSION

For the reasons stated above, the judgment should be affirmed in all respects.

Dated:     Brooklyn, New York
           April 25, 2024

                              Respectfully submitted,

                              BREON PEACE,
                              United States Attorney,
                              Eastern District of New York.

                    By:  _____/s/_____
                              SARA K. WINIK
                              ELLEN H. SISE
                              Assistant U.S. Attorneys

SUSAN CORKERY,
SARA K. WINIK,
ELLEN H. SISE,
Assistant United States Attorneys,
      (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 12,843 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        April 25, 2024

                        _____/s/_____

                        SUSAN CORKERY,
                        Assistant U.S. Attorney